Dana ROBERTS, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 03A01–0804–CR–169.

Court of Appeals of Indiana.

Oct. 15, 2008.

Transfer Denied Dec. 18, 2008.

Michael T. Wallace, Roberts & Bishop, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Joby D. Jerrells, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Dana Roberts appeals his murder conviction and sentence. We affirm.

### Issues

Roberts raises nine issues, which we consolidate and restate as:

I. whether the trial court properly denied his motion to correct error regarding alleged juror misconduct;

II. whether the trial court properly admitted certain evidence;

III. whether the prosecutor improperly approached a witness on the witness stand during trial;

IV. whether the jury was properly instructed;

V. whether there was sufficient evidence to convict him of murder;

VI. whether he received ineffective assistance of counsel; and

VII. whether his sixty-two year sentence is appropriate.

### Facts

On November 11, 2006, Roberts was living in Columbus with his girlfriend of eleven weeks, Faith Vanarsdale, and her two children, five-year-old T.R. and seven-year-old C.R. At approximately 11:30 p.m., Roberts returned home from work, the children were asleep on the couch, and Vanarsdale took a shower and went upstairs to go to bed. Roberts ate dinner, drank a forty-ounce beer, and went to the bedroom to go to bed.

When he got to the bedroom, Vanarsdale and Roberts began arguing. Vanarsdale slapped Roberts and began screaming. Roberts placed Vanarsdale in a chokehold until she lost consciousness. He wrapped his arm around Vanarsdale's neck, held her face to the mattress, and put his weight on top of her. Vanarsdale weighed approximately 100 pounds, and Roberts weighed approximately 200 pounds. When Roberts released Vanarsdale, she was dead. Vanarsdale's death was caused by a lack of blood flow to the brain and the inability to move air into her lungs. Roberts hid Vanarsdale's naked body under the bed, left the house, and drove to Indianapolis.

In the early morning hours of November 12, 2006, Roberts called 911 and reported the death. The 911 operator informed Roberts that he should go to the City County Building and turn himself in. Roberts did so, admitting to a Marion County Sheriff's Deputy that he had killed Vanarsdale. The incident was reported to the Columbus Police Department which eventually confirmed Vanarsdale's death. During an interview with Detective Marc Kruchten of the Columbus Police Department, Roberts admitted to killing Vanarsdale.

On November 13, 2006, the State charged Roberts with murder. At trial,

Roberts testified and again admitted to killing Vanarsdale. A jury found Roberts guilty, and the trial court sentenced him to sixty-two years. Roberts filed a motion to correct error alleging several errors. An evidentiary hearing was held on Roberts's motion to correct error, and the trial court denied the motion. Roberts now appeals.

## Analysis

### I. Juror Misconduct

■■■ Roberts claims that a juror improperly failed to disclose that she knew Roberts. "In certain circumstances, '[t]he failure of a juror to disclose a relationship to one of the parties may entitle the prejudiced party to a new trial.'" *Stephenson v. State*, 864 N.E.2d 1022, 1055 (Ind.2007) (citations omitted) (alteration in original), *cert. denied* — U.S. ——, 128 S.Ct. 1871, 170 L.Ed.2d 751. "To obtain a new trial based on a claim of juror misconduct, the defendant must demonstrate that the misconduct was gross and likely harmed the defendant." *Id.* Further, the defendant must present specific and substantial evidence establishing that a juror was possibly biased. *Id.* "The issue of juror misconduct is a matter within the trial court's discretion." *Lopez v. State*, 527 N.E.2d 1119, 1130 (Ind.1988).

In his motion to correct error Roberts claimed that one of the jurors was a friend of his mother's for over twenty years and that she had personal knowledge of him and his family. At the hearing on the motion to correct error, Roberts's father testified the juror "was a friend of the family during the early eighties." Tr. p. 882. At the same hearing, Roberts testified that the juror was one his teachers and that the juror's sister and Roberts's mother "were best friends for years." *Id.* at 886. Roberts also stated that in 2004 he spoke with the juror on the phone for approximately an hour.

This evidence directly contradicts the juror's affidavit, which was submitted to the trial court by the State in response to Roberts's motion to correct error. In her affidavit, the juror stated in part:

2. At no time during the trial did I believe that I had ever known the defendant. I believed Dana Roberts was a complete stranger to me.

3. After the trial, it was suggested to me that Dana Roberts may have been a student of mine approximately 30 years ago. I was a teacher at Central Middle School for several years and I do have some recollection of a student named Dana Roberts.

4. At no time during the entire trial did I recognize Mr. Roberts as a former student. In fact, I did not believe I knew him in any manner.

5. The fact that Mr. Roberts may have been a former student of mine did not affect my service as a juror.

App. p. 102.

Given the unequivocal nature of the juror's affidavit, it was unnecessary to take evidence from the other jurors regarding the alleged misconduct. Roberts has not established that the juror's alleged misconduct was gross and likely harmed him. Further, even if we were to accept Roberts's testimony as true, he has not shown that the juror was biased. The trial court did not abuse its discretion in rejecting Roberts's claim of juror misconduct.

### II. Admission of Evidence

Roberts makes several claims regarding the admission of evidence during trial. Generally, rulings on the admission of evidence are reviewed for abuse of discretion. *McHenry v. State*, 820 N.E.2d 124, 128 (Ind.2005).

### A. Prior Threats [1]

Roberts first argues that the trial court improperly admitted testimony from three of Vanarsdale's co-workers and friends that he had threatened to kill her. He contends that this evidence was inadmissible because it violated his Sixth Amendment right to confront witnesses and because it was inadmissible hearsay under the Indiana Evidence Rules.

■ "The Confrontation Clause of the Sixth Amendment provides: 'In all criminal prosecutions the accused shall enjoy the right ... to be confronted with the witnesses against him.'" *Davis v. Washington,* 547 U.S. 813, 821, 126 S.Ct. 2266, 2273, 165 L.Ed.2d 224 (2006). In *Crawford v. Washington,* 541 U.S. 36, 53–54, 124 S.Ct. 1354, 1365, 158 L.Ed.2d 177 (2004), the Supreme Court held that this provision bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Since *Crawford,* the Supreme Court has acknowledged that a critical portion of the *Crawford* holding is the phrase "testimonial statements" because "[o]nly statements of this sort cause the declarant to be a 'witness' within the meaning of the Confrontation Clause." *Davis,* 547 U.S. at 821, 126 S.Ct. at 2273. "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Id.,* 126 S.Ct. at 2273. In describing testimonial statements, the *Crawford* court observed:

The text of the Confrontation Clause reflects this focus. It applies to "witnesses" against the accused-in other words, those who "bear testimony." 2 N. Webster, An American Dictionary of the English Language (1828). "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Ibid. An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.*

*Crawford,* 541 U.S. at 51, 124 S.Ct. at 1364 (emphasis added).

Focusing on *Giles v. California,* ―― U.S. ――, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008), in which the Supreme Court addressed the doctrine of forfeiture by wrongdoing in the context of the Confrontation Clause, Roberts asserts that the admission of Vanarsdale's statements violated his Sixth Amendment rights because there is no evidence that he killed her to prevent her from testifying. Simply put, however, *Giles* is not applicable to our analysis today because Vanarsdale's statements to her friends were not testimonial.

Roberts claims that Vanarsdale's statements "were made to establish that Roberts caused her injuries and made threats." Appellant's Reply Br. p. 6. He claims, "Such statements would lead an objective witness to reasonably believe that the statements would be used at a trial at least for a matter involving domestic battery, as Ms. Vanarsdale had always avoided providing details to acquaintances." *Id.* at 6–7. This assertion by

1. Outside of the presence of the jury the parties discussed the admissibility of these statements and the trial court made a preliminary determination that this evidence was admissible. During the testimony of the first witness who testified about Roberts's threats, trial counsel made a contemporaneous objection, which the trial court overruled. Although trial counsel did not specifically object during the other two witnesses' similar testimony, we conclude that the issue was properly preserved with regard to all three witnesses.

Roberts is pure speculation. There is nothing in the record indicating that Vanarsdale made the statements in anticipation of a criminal prosecution. Vanarsdale's statements to her friends amounted to nothing more than a "casual remark to an acquaintance." *Crawford*, 541 U.S. at 51, 124 S.Ct. at 1364. Vanarsdale's statements did not implicate the Sixth Amendment because they were not testimonial.

■ Roberts also claims that Vanarsdale's statements to her friends were inadmissible hearsay under the Indiana Evidence Rules. Assuming that Vanarsdale's statements were inadmissible hearsay, we conclude that any objection to the admissibility of the statements was forfeited. Although in *Giles* the Supreme Court concluded that the common-law doctrine of forfeiture by wrongdoing only applies when the defendant procured the witness's unavailability by conduct "designed to prevent a witness from testifying," the analysis was limited to a defendant's Sixth Amendment right to confront witnesses. *Giles,* —— U.S. at ——, 128 S.Ct. at 2684. In *Giles,* the Supreme Court recognized the rights of states to adopt their own rules regarding non-testimonial statements. The *Giles* court specifically stated:

> only *testimonial* statements are excluded by the Confrontation Clause. Statements to friends and neighbors about abuse and intimidation, and statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules, which are free to adopt the dissent's version of forfeiture by wrongdoing.

*Id.,* 128 S.Ct. at 2692–93. As such, we accept the Supreme Court's invitation to take a slightly broader view of the doctrine of forfeiture by wrongdoing as advocated by Justice Breyer in his dissent in *Giles* as it applies to non-testimonial statements under Indiana law. *See id.,* 128 S.Ct. at 2695 (Breyer, J., dissenting).

Prior to the Supreme Court's decision in *Giles,* our supreme court considered the doctrine of forfeiture by wrongdoing and made the following observations:

> *Crawford* specifically recognized "forfeiture by wrongdoing" as an exception to the requirement of confrontation as a prerequisite to the admission of testimonial hearsay statements. 541 U.S. at 62, 124 S.Ct. 1354, 158 L.Ed.2d 177. This doctrine holds that a party who has rendered a witness unavailable for cross-examination through a criminal act, e.g., homicide, may not object to the introduction of hearsay statements by the witness on Confrontation Clause grounds. *See United States v. Emery,* 186 F.3d 921, 926 (8th Cir.1999). Indiana courts have never addressed the applicability of forfeiture by wrongdoing to a Confrontation Clause violation. The doctrine has a lengthy history and is recognized by the federal courts and courts of several sister states. *See, e.g., United States v. Carlson,* 547 F.2d 1346, 1359 (8th Cir.1976); *People v. Moore,* 117 P.3d 1 (Colo.Ct.App., 2004); *State v. Meeks,* 277 Kan. 609, 88 P.3d 789, 794 (2004); *State v. Gettings,* 244 Kan. 236, 769 P.2d 25, 28–29 (1989); *Holtzman v. Hellenbrand,* 92 A.D.2d 405, 460 N.Y.S.2d 591, 595–96 (N.Y.App.Div. 1983). More than a hundred years ago, the United States Supreme Court explained the rule as follows: "The Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against him; but if a witness is absent by his own [the accused's] wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away. The Constitution does not guarantee an accused person against the legitimate consequences

of his own wrongful acts." *Reynolds v. United States,* 98 U.S. 145, 158, 25 L.Ed. 244 (1878).

*Fowler v. State,* 829 N.E.2d 459, 467–68 (Ind.2005) (alteration in original), *cert denied* 547 U.S. 1193, 126 S.Ct. 2862, 165 L.Ed.2d 898.

■ Although the *Fowler* court addressed a broader view of the doctrine of forfeiture by wrongdoing in the context of the Confrontation Clause, which view was rejected in *Giles,* we conclude this broader view of forfeiture applies to non-testimonial statements whose admissibility is challenged under the Indiana Evidence Rules. Specifically, we hold that a party, who has rendered a witness unavailable for cross-examination through a criminal act, including homicide, may not object to the introduction of hearsay statements by the witness as being inadmissible under the Indiana Rules of Evidence. *See id.* at 468.

This conclusion is consistent with *Boyd v. State,* 866 N.E.2d 855, 857 (Ind.Ct.App. 2007), *trans. denied.* At issue in *Boyd* was the admissibility of statements, both under the Sixth Amendment and the Indiana Evidence Rules, that Boyd's wife made to police regarding Boyd battering her. After Boyd battered his wife and she made statements to the police, Boyd murdered her. Boyd was tried and convicted of his wife's murder and was then prosecuted for the battery. We concluded in part that this broader doctrine of forfeiture by wrongdoing applied to objections made pursuant to the Indiana Evidence Rules as a matter of common law. *Boyd,* 866 N.E.2d at 857 (citing Ind. Evid. R. 802 (excluding the admission of hearsay except as provided by law or by the Indiana Evidence Rules rules); Evid. R. 101(a) ("If these rules do not cover a specific evidence issue, common or statutory law shall apply.")).

We also address the issue of circular proof that was raised by Justice Souter in his concurring opinion in *Giles.* More specifically, Justice Souter was concerned about situations in which a defendant's wrongdoing was the basis for the admission of his or her statements during a trial in which the State sought to convict the defendant of the same wrongful act.

It was, and is, reasonable to place the risk of untruth in an unconfronted, out-of-court statement on a defendant who meant to preclude the testing that confrontation provides. The importance of that intent in assessing the fairness of placing the risk on the defendant is most obvious when a defendant is prosecuted for the very act that causes the witness's absence, homicide being the extreme example. If the victim's prior statement were admissible solely because the defendant kept the witness out of court by committing homicide, admissibility of the victim's statement to prove guilt would turn on finding the defendant guilty of the homicidal act causing the absence; evidence that the defendant killed would come in because the defendant probably killed. The only thing saving admissibility and liability determinations from question begging would be (in a jury case) the distinct functions of judge and jury: judges would find by a preponderance of evidence that the defendant killed (and so would admit the testimonial statement), while the jury could so find only on proof beyond a reasonable doubt. Equity demands something more than this near circularity before the right to confrontation is forfeited, and more is supplied by showing intent to prevent the witness from testifying.

*Giles,* —— U.S. at ——, 128 S.Ct. at 2694

(Souter, J., concurring).[2]

This concern of circular proof was not at issue in *Boyd* and is not at issue today. In *Boyd*, Boyd was convicted of murdering his wife before her statements were used against him in the battery trial. Therefore, the wrongful act of murder that was basis of the forfeiture of his right to object to the admissibility of his wife's prior statements at the battery trial had already been conclusively established. More importantly, in this case, Roberts has never disputed that he killed Vanarsdale. Throughout these proceedings Roberts admitted to killing Vanarsdale. Under these circumstances, the concerns of the level of proof of the wrongdoing that is required to establish forfeiture is not at issue. The admissibility of a statement where such proof of wrongdoing is not present is a question for another day.

We conclude that Vanarsdale's statements to her friends were non-testimonial and did not implicate Roberts's Sixth Amendment rights. As for the admissibility of the statements under the Indiana Rules of Evidence, Roberts forfeited his right to confront Vanarsdale about the statements when he killed her. The trial court did not abuse its discretion in admitting these statements.

### B. Indiana Evidence Rule 404(B) Evidence

■ Roberts argues that the trial court abused its discretion when it allowed the State on rebuttal to introduce evidence from three other women that Roberts had choked them. Roberts, however, did not object to the testimony of these three witnesses at trial. Failure to object at trial to the admission of evidence results in waiver of that issue on appeal. *Kubsch v. State,*

784 N.E.2d 905, 923 (Ind.2003). This issue is waived.

Waiver notwithstanding, this evidence was properly admitted. Indiana Evidence Rule 404(b) provides in part, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...." This rule attempts to prohibit a jury from making the "forbidden inference" that because of a defendant's criminal propensity, he or she committed the charged act. *Bald v. State,* 766 N.E.2d 1170, 1173 (Ind.2002). In deciding whether character evidence is admissible under this rule, the trial court must: (1) determine whether the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the person's propensity to engage in a wrongful act; and (2) balance the probative value of the evidence against its prejudicial effect pursuant to Indiana Evidence Rule 403. *Bassett v. State,* 795 N.E.2d 1050, 1053 (Ind.2003).

Evidence is relevant if it has any tendency to make the existence of any fact of consequence to the determination of the action more or less probable that it would be without the evidence. Evid. R. 401. Indiana Evidence Rule 403 provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...."

■ Although the testimony about other incidents of choking might have been inadmissible, otherwise inadmissible evidence may become admissible where the

---

**2.** Again we note that the Sixth Amendment was at issue in *Giles.* Nevertheless, this issue of proving the wrongdoing is relevant to our determination of the forfeiture of one's right to object to hearsay under the Indiana Evidence Rules.

defendant "opens the door" to questioning on that evidence. *See Jackson v. State,* 728 N.E.2d 147, 152 (Ind.2000). "A party may 'open the door' to otherwise inadmissible evidence by presenting similar evidence that leaves the trier of fact with a false or misleading impression of the facts related." *Schmidt v. State,* 816 N.E.2d 925, 946 (Ind.Ct.App.2004), *trans. denied.*

During Roberts's direct examination, he testified that he had learned how to perform a chokehold during his martial arts training and that he had performed chokeholds approximately 100 times in the past. Roberts explained that if you don't let go, the person being choked will "pass out." Tr. p. 652. Roberts explained that "every time" he had performed a choke hold in the past it had "always been a two hundred plus pound man...." *Id.* at 654.[3] Roberts's direct testimony opened the door to the rebuttal evidence because his testimony left the jury with the false and misleading impression that he had only performed chokeholds on other men in a martial arts setting. The trial court did not abuse its discretion in admitting this evidence.

### C. T.R.'s Testimony

■ Roberts also argues that the trial court abused its discretion when it admitted into evidence the testimony of Vanarsdale's daughter, T.R. Roberts claims that her testimony was irrelevant and was used "to create sympathy with the jury regarding the death of Ms. Vanarsdale." Appellant's Br. p. 24. Roberts, however, did not object to T.R.'s testimony. Failure to object at trial to the admission of evidence results in waiver of that issue on appeal.

*Kubsch,* 784 N.E.2d at 923. This issue is waived.

■ Nevertheless, evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable that it would be without the evidence. Evid. R. 401. During her testimony, T.R. stated that on the night of her mother's murder she went upstairs and Roberts told her to go back downstairs. T.R.'s testimony is relevant to the extent that it confirmed that Roberts was at the Vanarsdale house in Vanarsdale's bedroom on the night of the murder. The trial court did not abuse its discretion in allowing this testimony.

### III. Prosecutor Approaching a Witness on the Witness Stand

■ Roberts contends that during one of the State's witness's testimony, the prosecutor improperly approached the witness and had a private conversation with him. Roberts urges that he was prejudiced by this action because the "nature of the prompting was unknown." Appellant's Br. p. 25. A trial court has wide discretion in managing the conduct of a trial in such a manner that facilitates the ascertainment of truth, insures fairness, and obtains economy of time and effort commensurate with the rights of both society and the defendant. *Utley v. State,* 589 N.E.2d 232, 239 (Ind.1992), *cert. denied* 506 U.S. 1058, 113 S.Ct. 991, 122 L.Ed.2d 142. The trial court's exercise of discretion will not be disturbed unless the defendant demonstrates that he or she was prejudiced by an abuse of that discretion. *Id.*

---

**3.** During a sidebar after Roberts completed his direct testimony, the prosecutor suggested that the defendant had opened the door regarding the circumstances in which he has performed chokeholds and left the jury with a false impression. The trial court agreed and noted that Roberts voluntarily offered the information and that it was "not elicited directly by counsel for the defendant." Tr. p. 665.

Although trial counsel did not object to this, Roberts concedes that "the State approached the witness with the intent to admonish the witness prior to the testimony...." Appellant's Br. p. 24. This is consistent with the record, in which the prosecution requested to give the witness an admonition as she had done earlier. *See* Tr. p. 626. Specifically, before a previous witness who was offering similar testimony testified, the prosecutor instructed the witness not to testify about an allegation of a specific bad act by Roberts. *See id.* at 604.

This is consistent with the trial court's recollection of the events. At the hearing on Roberts's motion to correct error, the trial court stated:

> there was once or twice during the trial, when the State ... there was a witness on the witness stand and the State ... there was some evidence that was excluded, okay, and the State, because of rulings that were ongoing throughout the course of the trial, as it relates to some of the evidence, the ... State asked permission to be able to approach the witness and to inform the witness that you may not testify about X. Okay. Prior bad act, as I recall. Although this has been some time ago. I believe it was related to a prior bad act of the defendant and so, the State wanted to make sure that the witness did not go into that witness's knowledge as it relates to conduct of the defendant previously. And so the Court granted the State permission to instruct the witness not what to say, but rather what not to say.

*Id.* at 870 (ellipses in original). Without any evidence to the contrary, we will assume that the admonitions were intended to preserve the integrity of the proceeding and benefited Roberts. Roberts has not established reversible error.

### IV. *Involuntary Manslaughter Instruction*

 Roberts argues that the jury should have been instructed on involuntary manslaughter in addition to the murder and reckless homicide instructions that were given. The trial court concluded that based on the manner in which the State pled the case, involuntary manslaughter was not a lesser included offense of the murder charge.

 "When a defendant requests an instruction covering a lesser-included offense, a trial court applies the three-part analysis set forth in *Wright v. State*, 658 N.E.2d 563, 566–67 (Ind.1995)." *Wilson v. State*, 765 N.E.2d 1265, 1271 (Ind.2002). The first two parts of the *Wright* test require the trial court to determine whether the offense is either inherently or factually included in the charged offense. *Id.* If it is, the trial court must determine whether there is a serious evidentiary dispute regarding any element that distinguishes the two offenses. *Id.* If a jury could conclude that the lesser offense was committed but not the greater, then it is reversible error for a trial court not to give an instruction, when requested, on the inherently or factually included lesser offense. *Id.*

Murder is defined as knowingly or intentionally killing another human being. Ind. Code § 35–42–1–1. Class C felony involuntary manslaughter is defined as killing another human being while committing or attempting to commit a Class C or a Class D felony that inherently poses a risk of serious bodily injury, a Class A misdemeanor that inherently imposes a risk of serious bodily injury, or battery. I.C. § 35–42–1–4(c). Here, the charging information provided in part, "That on or about November 12, 2006 in Bartholomew County, State of Indiana, the defendant, Dana

E. Roberts did knowingly kill another human being, to-wit: Faith Vanarsdale." App. p. 11. Roberts was not charged with battery.

 It is undisputed that involuntary manslaughter is not an inherently included lesser offense of murder. *Wilson*, 765 N.E.2d at 1271; *Wright*, 658 N.E.2d at 569. "If the charging instrument alleges that the means used to commit the crime charged include all of the elements of the alleged lesser included offense, then the alleged lesser included offense is *factually* included in the crime charged...." *Wright*, 658 N.E.2d at 567.

The *Wright* court discussed the circumstances in which the State may foreclose an instruction on a lesser included offense. The court observed, "the State cannot draft an information that forecloses an instruction on an inherently lesser included offense of the crime charged...." *Id.* at 569. "What is clear, however, ... is that the State may only foreclose instruction on a lesser offense that is not inherently included in the crime charged by omitting from a charging instrument factual allegations sufficient to charge the lesser offense." *Id.* at 570 (citing *Jones v. State*, 438 N.E.2d 972, 975 (Ind.1982) ("By the same token, the state through its drafting can foreclose as to the defendant, the tactical opportunity to seek a conviction for a lesser offense. The point is that absolute discretion rests in the state to determine the crime(s) with which a defendant will be charged.")).

Roberts was charged only with knowingly killing another human being—the charging information contains no reference to a battery that could have been a basis for an involuntary manslaughter instruction. Contrary to Roberts assertion that the State's drafting of the complaint was strange and lacked detail, the State was within its discretion to draft the charging information in a manner that foreclosed the opportunity for Roberts to seek a conviction on a lesser offense. *See Champlain v. State*, 681 N.E.2d 696, 702 (Ind. 1997) (observing that although a shooting can in some situations be classified as a battery, where the information alleged only that defendant "did knowingly kill another human being, to-wit: Sherri Reeves Vanlue," the information did not assert a battery, and involuntary manslaughter was not a factually included lesser offense of murder). Although Roberts directs us to the probable cause affidavit for a description of the method of the alleged murder, it was within the State's discretion to determine the manner in which it would proceed against Roberts. The trial court properly rejected Roberts's involuntary manslaughter instruction.

### V. Sufficiency of the Evidence

 Roberts claims that there is insufficient evidence to support his murder conviction. Upon a challenge to the sufficiency of evidence to support a conviction, we do not reweigh the evidence or judge the credibility of the witnesses, and we respect the jury's exclusive province to weigh conflicting evidence. *McHenry v. State*, 820 N.E.2d 124, 126 (Ind.2005). We must consider only the probative evidence and reasonable inferences supporting the verdict. *Id.* If the probative evidence and reasonable inferences drawn therefrom could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt, we must affirm the conviction. *Id.*

Roberts argues that the evidence is insufficient to establish that he knowingly or intentionally killed Vanarsdale. A person who knowingly or intentionally kills another human being commits murder. I.C. § 35–42–1–1. Here the State charged Roberts with knowingly killing Vanarsdale, and the jury was only instructed on the

culpability of "knowingly." A person engages in conduct knowingly if, when he or she engages in the conduct, he or she is aware of the high probability that he or she was doing so. I.C. § 35–41–2–2(b).

Here, there is overwhelming evidence that Roberts knowingly killed Vanarsdale, whose death was caused by the lack of blood flow to her brain and the inability to move air into her lungs. *See* Tr. pp. 600–01. In addition to the evidence that Roberts had previously threatened to kill Vanarsdale, there is abundant evidence that Roberts had choked numerous people in the past—sometimes in the martial arts setting and sometimes in the domestic relations setting. Further, according to Roberts's own trial testimony, the couple's relationship was tumultuous to say the least. Roberts explained that during their eleven-week relationship they broke up five times.

In describing the altercation that led to Vanarsdale's death, Roberts stated that during their argument, he grabbed her by the neck, she hit him in the jaw, and "the fight was on." *Id.* at 651. Roberts repeatedly grabbed Vanarsdale by the neck, and every time he let go she would scream and yell. He explained that he was "trying to get control of her" and to "shut her up" by grabbing her neck. *Id.* Roberts testified that he was trying to "choke her out" or render her unconscious. *Id.* At that time Roberts "was so mad that's what [he] wanted, cause he wanted her quiet." Exhibit 32 p. 19. To do this, Roberts wrapped his arm around her neck and laid on top of her, pushing her face into the mattress. Roberts weighed over 200 pounds and Vanarsdale weighed approximately 100 pounds. Roberts stated that once Vanarsdale stopped moving he "let off" the pressure on her neck, but kept his weight on top of her "for a while." *Id.* at 653. After Roberts released her and

turned on the light, he realized Vanarsdale was dead. He did not perform CPR or call 911. Instead, he hid her naked body under the bed and left the house. This evidence and reasonable inferences drawn therefrom is sufficient to support the jury's verdict that Roberts knowingly killed Vanarsdale.

## VI. Ineffective Assistance of Counsel

Roberts claims that he received ineffective assistance of trial counsel. "To establish a claim for ineffective assistance of counsel, a defendant must satisfy two prongs: First, the defendant must demonstrate that counsel performed deficiently; second, the defendant must demonstrate that prejudice resulted." *State v. McManus,* 868 N.E.2d 778, 790 (Ind.2007) (citing *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984)), *cert. denied* —— U.S. ——, 128 S.Ct. 1739, 170 L.Ed.2d 543. These two prongs are independent inquiries, either of which may be sufficient for disposing of a claim of ineffective assistance of counsel. *Id.*

Deficient performance is representation that fell below an objective standard of reasonableness by the commission of errors so serious that the defendant did not have the "counsel" guaranteed by the Sixth Amendment. *Id.* Consequently, our inquiry focuses on counsel's actions while mindful that isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render counsel's representation ineffective. *Id.* Indeed, there is a strong presumption that counsel rendered adequate assistance. *Id.* "To satisfy the second prong, the defendant must show prejudice: a reasonable probability (i.e. a probability sufficient to undermine confidence in the outcome) that, but for counsel's errors, the result of the proceeding would have been different."

*Henley v. State,* 881 N.E.2d 639, 644 (Ind. 2008).

As examples of trial counsel's ineffectiveness, Roberts points to the failure to object to the prosecutor approaching the witness, the failure to question the juror regarding her knowledge of the defendant, the failure to properly object to the testimony of Vanarsdale's friends and coworkers regarding Roberts's threats to kill her, and the failure to object to the State's rebuttal witnesses. We have already addressed these questions on the merits and affirmed the decisions of the trial court. These arguments do not provide a basis for a claim of ineffective assistance of counsel.

Roberts also argues that trial counsel should have not have elicited testimony from T.R. indicating that a caseworker told her that Roberts had killed her mother because it was inadmissible hearsay. Even if this statement was inadmissible hearsay, in this case it was undisputed that Roberts killed Vanarsdale. Roberts has not established that he was prejudiced by this line of questioning.

Roberts also claims that he wanted to give the jury a complete picture of his relationships with the witnesses who testified that Roberts had choked them and was not allowed to do so. Roberts, however, offers no argument as to what his additional testimony would have established. Moreover, trial counsel cross-examined two of the three rebuttal witnesses, and we are unwilling to second-guess trial counsel's strategic decision not to recall Roberts on surrebuttal.

Finally, Roberts claims that trial counsel failed to object to leading questions by the prosecutor of two of the State's witnesses. Roberts, however, fails to explain how the failure to object amounts to more than just an isolated mistake or how he was prejudiced by the failure to object. Roberts has

not established that he received ineffective assistance of counsel.

## VII. Sentence

 Finally, Roberts argues that his sixty-two year sentence is inappropriate. He claims, "The sentence was inappropriate in light of the two aggravating factors, the existence of the mitigating factor, and the nature of the offense." Appellant's Br. p. 31. In assessing the appropriateness of a sentence, we consider the nature of the offense and the character of the offender. *See* Ind. Appellate Rule 7(B). Although Indiana Appellate Rule 7(B) does not require us to be "extremely" deferential to a trial court's sentencing decision, we still must give due consideration to that decision. *Rutherford v. State,* 866 N.E.2d 867, 873 (Ind.Ct.App.2007). We also understand and recognize the unique perspective a trial court brings to its sentencing decisions. *Id.* "Additionally, a defendant bears the burden of persuading the appellate court that his or her sentence is inappropriate." *Id.*

Regarding the nature of the offense, Roberts killed his girlfriend of eleven weeks by wrapping his arm around her neck and lying on top of her, which prevented blood from flowing to her brain and prevented her from breathing. Roberts left Vanarsdale's naked body under the bed and allowed her young children to find the body.

As for his character, although Roberts reported the death to the police and turned himself in, he disputed that he murdered Vanarsdale and a multiple day trial ensued. Roberts's cooperation with the police is not overwhelmingly mitigating.

Roberts also explained that choking people was his "M.O." Tr. p. 676. During the trial, he was questioned whether he had ever choked anyone out of anger before. Roberts responded, "That . . . yes I have,

actually. A few ... I've grabbed ... grabbed ... that's a little bit of my, maybe my M.O. of controlling people, confronting people. Male ... male or female, if I'm going to be violent with them, I may grab their neck." *Id.* (ellipses in original). This statement does not speak well of Roberts's character.

Roberts's criminal history includes numerous arrests and convictions for two counts of Class A misdemeanor battery in 1994, three counts of Class A misdemeanor check deception in 1994, assault and battery and assault with the intent to rape in Massachusetts in 1998, and Class A misdemeanor domestic battery in 2003. Roberts's criminal history does not suggest that he has led a law abiding life. Considering the nature of the offense and the character of the offender, we conclude that Roberts's sixty-two year sentence, which is three years less than the maximum sentence, is not inappropriate.

### Conclusion

The failure of a juror to disclose her prior knowledge of Roberts did not amount to juror misconduct. The trial court did not abuse its discretion in admitting certain evidence. The prosecutor approaching a witness on the stand was not reversible error. The trial court properly declined to instruct the jury on involuntary manslaughter. There is sufficient evidence to support Roberts's murder conviction. Roberts has not established that he received ineffective assistance of counsel. Finally, Roberts's sentence is appropriate. We affirm.

Affirmed.

FRIEDLANDER, J., and DARDEN, J., concur.