## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 31 2017, 12:00 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Scott L. Barnhart
Brooke Smith
Keffer Barnhart, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Devlin C. Decker,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

October 31, 2017

Court of Appeals Case No.
84A01-1702-CR-332

Appeal from the Vigo Superior Court

The Honorable John Roach, Judge

Trial Court Cause No.
84D01-1401-MR-53

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Devlin C. Decker (Decker), appeals his convictions for murder, a felony, Ind. Code § 35-42-1-1(1) (2013); and aggravated battery, a Class B felony, I.C. § 35-42-2-1.5 (2013).

We affirm in part and reverse in part.

# ISSUES

Decker raises three issues on appeal, which we restate as follows:

(1) Whether Decker's convictions for murder and aggravated battery violate the Indiana Constitution's prohibition against double jeopardy;

(2) Whether Decker should have been granted a mistrial in light of prosecutorial misconduct; and

(3) Whether the State presented sufficient evidence to support Decker's conviction for murder.

# FACTS AND PROCEDURAL HISTORY

On New Year's Eve 2013, Pamela Jones (Jones) and her boyfriend, Decker, decided to host a small party at Jones' home in Terre Haute, Vigo County, Indiana. At the time, Decker had been living with Jones for several months, and the two were expecting a child together. Around 5:00 p.m., Jones and Decker drove to the home of Decker's uncle, Phillip Evans (Evans), to pick up Evans and his roommate, Joshua Thomas (Thomas), for the party. En route back to Jones' house, they stopped at a gas station so that Evans could withdraw money from an ATM. When he returned to the vehicle, Evans

accused Thomas of using Evans' bank card to steal money from Evans' account. Thomas denied doing so, but Evans remained angry.

[5] The group returned to Jones' house, and for the next several hours, they drank liquor and beer and became heavily intoxicated. At some point in the evening, Thomas began flirting with Jones. When Jones informed Decker about Thomas' unwelcome advances and indicated that she no longer wanted him at the party, Decker "got mad," which ultimately led to Decker and Thomas engaging in a verbal and physical altercation in the living room. (Tr. Vol. III, p. 78). Because Jones' young child was asleep in the house, she ordered the two men "to take it outside." (Tr. Vol. III, p. 79). Evans followed Decker and Thomas outside, indicating to Jones that he would break up the brawl.

[6] Jones' next-door neighbors, Eric (Eric) and Diana (Diana) Goucher, were watching television when they heard a commotion coming from Jones' front porch. From their window, Eric and Diana had a direct view of Jones' porch. According to Eric, one male, later identified as Decker, punched and kicked another male, later identified as Thomas, as Thomas pleaded with Decker to stop. While a third man, later identified as Evans, stood there watching, Decker punched Thomas in the face, knocking Thomas to the ground. Decker continued to punch and kick Thomas, eventually kicking Thomas off the porch onto the concrete a few feet below. Thomas brought himself up to his hands and knees and attempted to stand, at which point Decker picked up a solid wood table, weighing approximately forty to fifty pounds, from the porch and "smashed it over" Thomas' head and shoulders. (Tr. Vol. III, p. 41). Decker

then turned and walked back in the house. Thomas stood and also attempted to return to the house, but Evans snatched him up and pinned him against the wall of the house. After looking around as if to check whether anybody was watching, Evans punched Thomas. Thomas went limp, so Evans spun him around and dropped him off the porch. Decker emerged from the house, and as Evans repeatedly kicked Thomas in the torso, Decker stomped on Thomas' face. This kicking and stomping lasted for at least thirty seconds, until Decker and Evans looked up and realized that Eric and Diana were observing the entire matter through their window. It was obvious to Eric that, by this point, Thomas was unconscious, and according to both Eric and Diana, Thomas never fought back in any manner or otherwise defended himself. Diana had called 911 as soon as they saw Decker pick up the wood table.

[7] Once Decker and Evans noticed Eric and Diana watching, Decker "just smacked [Thomas] on his face and said hey, come on, come on get up, get up." (Tr. Vol. III, p. 60). When Thomas did not move, Decker and Evans attempted to drag Thomas toward Jones' vehicle, but Evans quickly decided against this and returned to the house. Despite his effort, Decker was unable to drag Thomas without assistance. At that time, which was shortly before 8:00 p.m., Jones' cousin, Courtney Dailey (Dailey), and her boyfriend, Camron Wormser (Wormser), drove up to the house. Jones came out to greet them, and, ignoring the fact that Thomas was lying on the ground unconscious, she escorted Dailey inside and laughingly informed Dailey that Decker "had gotten into it with some guy." (Tr. Vol. III, p. 126). Decker approached Wormser and, after

explaining that Thomas was "knocked out and needed a ride home," asked Wormser for assistance in getting Thomas into Jones' vehicle. (Tr. Vol. III, p. 157). Wormser noticed that Thomas was not moving, and "it sounded like [he] was snoring." (Tr. Vol. III, p. 155). Nevertheless, he helped Decker drag Thomas' body across the yard. Again, Decker "started kicking [Thomas] in the head" and stated, "[T]his is how we carry bitch newbys [*sic*] like you . . . out of the hood." (Tr. Vol. III, pp. 158, 168). Wormser warned Decker to stop or he would not assist.

[8] Before Decker and Wormser could drag Thomas all the way to Jones' vehicle, officers with the Terre Haute Police Department arrived. Decker immediately ran into the house and, "panicking," told Jones that the police were there and that he was going to be taken to jail because "he had stabbed [Thomas]." (Tr. Vol. III, p. 94). Decker quickly changed his blood-stained shirt and fled out the back door. Later, when Evans came into the house, he also informed Jones and Dailey that he had stabbed Thomas. Hours later, Decker appeared at the home of Kenneth Carter (Carter), who was Decker's friend and Jones' stepbrother, and stated "[t]hat he thought he'd killed somebody" and that, after punching and kicking and hitting Thomas with a table, both he and Evans had stabbed him. (Tr. Vol. VI, p. 92).

[9] The first officers on the scene observed that Thomas was unresponsive, and he had "agonal respirations," which is typical end-of-life breathing when the body is not getting sufficient oxygen. (Tr. Vol. III, p. 217). The officers administered CPR, and when they lifted his shirt to apply defibrillator pads, they observed a

laceration on his chest. Medics arrived and took over treatment and transported Thomas to the hospital. Within minutes of arriving at the hospital, Thomas was pronounced dead. During their subsequent investigation, officers discovered a bloody knife on the ground near the porch; testing confirmed the blood came from Thomas.

[10] An autopsy revealed that Thomas had sustained a number of abrasions to his head and torso, as well as three stab wounds: one near his right armpit, which did not enter the chest cavity; one to his lower neck/upper back, which missed the spinal column; and one to his lower left chest, which punctured the diaphragm, liver, and heart. Absent extenuating circumstances, the stab wounds to the right armpit and lower neck/upper back were not life threatening. The third stab wound to the lower left chest, however, was fatal as it perforated the heart and caused the chest cavity to fill with blood, which resulted in one of Thomas' lungs collapsing. During the autopsy, the forensic pathologist also collected vitreous fluid (*i.e.*, fluid from inside the eyeball) for a toxicology screen. At the time of his death, Thomas had a blood alcohol concentration of .457, which is "almost six times th[e] level" that the State of Indiana recognizes as being intoxicated for the purposes of operating a vehicle. (Tr. Vol. IV, p. 195). In such an intoxicated state, Thomas would have been unable to defend himself. In fact, he likely would have been "approaching [a] comatose state." (Tr. Vol. IV, p. 196).

[11] On January 8, 2014, the State filed an Information, charging Decker with one Count of murder, a felony, I.C. § 35-42-1-1(1) (2013); and one Count of

aggravated battery, a Class B felony, I.C. § 35-42-2-1.5 (2013). On October 3 through October 6, 2016, the trial court conducted a jury trial. At the close of the evidence, the jury rendered guilty verdicts on both Counts. Accordingly, the trial court entered a judgment of conviction for murder, a felony; and aggravated battery, a Class B felony. On January 12, 2017, the trial court held a sentencing hearing. For the murder conviction, the trial court ordered a sixty-year sentence, fully executed in the Indiana Department of Correction. As to the aggravated battery conviction, the trial court sentenced Decker to an executed term of fifteen years. The trial court ordered the sentences to run concurrently, for an aggregate term of sixty years.

[12]    Decker now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

### I. *Double Jeopardy*

[13]    Decker claims that his convictions for murder and aggravated battery violate Indiana's prohibition against double jeopardy. Article 1, Section 14 of the Indiana Constitution provides that "[n]o person shall be put in jeopardy twice for the same offense." "[T]wo or more offenses are the same offense in violation of [this provision] if, with respect to either the statutory elements of the challenged crimes or the actual evidence used to obtain convictions, the essential elements of one challenged offense also establish the essential elements of another challenged offense." *Garrett v. State*, 992 N.E.2d 710, 719 (Ind. 2013) (citing *Richardson v. State*, 717 N.E.2d 32, 49-50 (Ind. 1999)).

[14]     Here, Decker argues that both convictions were supported by the same actual evidence. "The actual evidence test prohibits multiple convictions if there is 'a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense.'" *Davis v. State*, 770 N.E.2d 319, 324 (Ind. 2002) (quoting *Richardson*, 717 N.E.2d at 53). However, there is no double jeopardy violation if "the evidentiary facts establishing the essential elements of one offense also establish only one or even several, but not all, of the essential elements of a second offense." *Garrett*, 992 N.E.2d at 719 (quoting *Spivey v. State*, 761 N.E.2d 831, 833 (Ind. 2002)). A "reasonable possibility" that a jury relied on the same facts for two convictions "requires substantially more than a logical possibility." *Id.* (quoting *Lee v. State*, 892 N.E.2d 1231, 1236 (Ind. 2008)). Indiana's Double Jeopardy Clause allows for "convictions for multiple offenses committed in a protracted criminal episode" so long as "the case is prosecuted in a manner that insures that multiple guilty verdicts are not based on the same evidentiary facts." *Id.* at 720 (quoting *Richardson*, 717 N.E.2d at 53 n.46). We must consider whether the jury "may have latched on to exactly the same facts for both convictions." *Id.* (quoting *Lee*, 892 N.E.2d at 1236). Thus, "[w]e evaluate the evidence from the jury's perspective and may consider the charging information, jury instructions, and arguments of counsel." *Id.* (citing *Lee*, 892 N.E.2d at 1234).

[15]     Decker was convicted of murder and aggravated battery. For the former, the State was required to prove that Decker "knowingly or intentionally kill[ed]"

Thomas. I.C. § 35-42-1-1(1). As for the latter, the State was obligated to prove that Decker "knowingly or intentionally inflict[ed] injury on [Thomas] that create[d] a substantial risk of death." I.C. § 35-42-2-1.5. Theoretically, there is evidence in the record to independently support each charge. However, Decker insists that the State, by generically charging the crimes and by failing to "delineate which facts were related to each [C]ount" during arguments, impelled the jury to utilize the same evidence for both crimes. (Appellant's Br. p. 12). We agree.

[16] The charging Information alleges that Decker committed the crimes of murder and aggravated battery by simply setting forth the statutory elements of the crimes without any reference to the factual basis for each. During the State's opening and closing arguments, the State heavily emphasized that Decker's involvement in the fight—from punching and stomping on Thomas' head to slamming a wooden table down on Thomas' head to stabbing Thomas— ultimately led to Thomas' death, notwithstanding whether it was Decker or Evans who delivered the fatal stab. Throughout its arguments, the State repeatedly reiterated the facts of the case without ever specifically outlining which evidence supported each charge.

[17] Although the State's closing argument spanned more than twenty pages of the transcript, the following excerpts particularly illustrate how the State combined the evidentiary facts as being supportive of both murder and aggravated battery:

> We know the injuries to . . . Thomas. We know that there was
> [*sic*] three (3) stab wounds. You heard [the forensic pathologist]

testify about the stab wound which was in fact fatal. We know that the blunt force trauma as well and we know that Thomas was pronounced dead shortly after arriving at Regional Hospital. . . . [W]e know the criminal acts in this, in this case or charge, are in fact Murder. That on or about December 31ˢᵗ 2013, . . . Decker knowingly killed . . . Thomas. Aggravated battery, on or about December 31ˢᵗ 2013, . . . Decker knowingly inflicted injury on . . . Thomas which created substantial risk of death. . . . Now let[']s look in this case of what shows [Decker] committed the act of Murder and committed the act of Aggravated Battery. . . . The evidence showed that Decker was and I will claim the first aggressor. Okay. There is [*sic*] no injuries whatsoever on . . . Decker observed by anybody. Decker hit Thomas with his fist. Decker knocked Thomas off the porch. He hit him in the head with a 2 x 4 table. He stomped him in the head. He stabbed Thomas. The testimony from two (2) separate individuals. [Jones] said that . . . Decker told her that he had stabbed Thomas once. That night he went over to [Carter's] and said that he had stabbed . . . Thomas and even made the stabbing motion. Decker moved the body. The evidence showed in this case that . . . Decker participated in the events leading to the death of . . . Thomas. We know . . . Thomas passed away. We have evidence of that [from the forensic pathologist]. Under these circumstances the law does not require the State to put forth or show who delivered the fatal blow. When you have two (2) individuals such as . . . Decker and . . . Evans, when they are both participating together, they're both equally criminally responsible for the outcome. There is no evidence in this case whatsoever that there were [*sic*] anybody outside with . . . Thomas beside . . . Decker and . . . Evans. No evidence whatsoever. . . . Wormser came later when they were trying to drag him out to the vehicle. But there was nobody else present. This is accompli[ce] liability. . . . There's no doubt, there's no doubt that Decker punche[d] Thomas. There's no doubt that Decker hit Thomas over the head with the table. There's no doubt that Decker kicked Thomas. There's no doubt that Decker kicked Thomas in the head. There's no doubt that he stomped

him in the head with his shoes. There's no doubt that Decker tried to move the body. There's no doubt that Decker participated in the events which le[d] to Thomas' death. And under these circumstances, that is Murder. That is Aggravated Battery. Mere participation in an illegal act is sufficient to sustain a conviction for the criminal act charged. Mere participation. That's what accompli[ce] liability is. . . . Thomas was knowingly killed. The facts show it. The evidence shows it. And that . . . Decker was actively involved in that and committed the act of Murder himself.

* * * *

Aggravated Battery. On or about December 31st 2013, [Decker] did knowingly. We're looking at the same element of knowingly. The same facts apply in this case. Inflict injury. We seen [*sic*] the injury to . . . Thomas from the blunt force[] trauma to the stab wounds to the kicking in the head. Inflict injury that creates a substantial risk of death. Well we know in this case that he did in fact die.

* * * *

Decker not only was the first aggressor. He hit Thomas with his fist. He hit him with a 2 x 4 table. He hit Thomas in the head. He stomped Thomas in the head. He tried to remove the body. Decker cannot dispute that he was involved. There is no doubt that Decker participated in the events that evening. That's all that's needed for murder ladies and gentlemen under the accompli[ce] liability statute. Under the instruction that you get, participation in the events leading to the death. Aiding, inducing or causing is sufficient. Who delivered the final blow? We have two (2) people acting in concert to deliver the fatal blow. Our law as determined that under those circumstances that both individuals are in fact guilty of the same. Two (2) participants act together are equally and criminally responsible under the law. Accompli[ce] liability. Two (2) or more persons knowingly combine to commit a crime. They're each guilty of the acts of the (inaudible). Any one who joins with another, either in part are liable as they did (inaudible—coughing). That is accompli[ce] liability. You're responsible, you choose to act with

another individual and that result, in the result that we have here, you are guilty just as if you had delivered the fatal blow. The evidence proved that Decker cannot deny his involvement in . . . Thomas' death and that's murder. In other words it does not matter whether Decker delivered the fatal blow. If he aided, induced or caused . . . Evans to murder . . . Thomas. He is just as guilty. But, but, you don't have to look just at the theory of accompli[ce] liability. Decker stabbed . . . Thomas.

* * * *

Actions speak louder than words. [Decker] repeatedly hit Thomas . . . in the head and the upper torso with his hands. He hit him over the head with the wooden table all while Thomas was begging and pleading for him to stop. Decker returned and started stomping on Thomas again. Drags Thomas' body across the yard and tries to put it in the car to get rid of it. Decker spits on him while he lay there dying. Decker then takes off running. . . . If you read the instruction that you get on murder, is knowingly or intentionally. I have showed [*sic*] you the facts that go with knowingly. I will also say that the State has set forth facts which showed that he intended to kill him. Not only knowingly killed him but intended to kill him. State doesn't have to prove intent. Simply knowingly. Knowingly or intentionally. Thomas never fought back at any time. Targeted Thomas' head. Hit him over the head with a table. Left him and came back out. Stomped him. Stabbed him with a knife. He intended to kill him. Spit on him. No medical assist. What are they are going to do? They were going to, according to him, take him out of the hood. Actions infer guilt.

* * * *

On December 31st 2013 . . . Decker killed . . . Thomas. On that same date on December 31st 2013 . . . Decker knowingly inflicted injury on . . . Thomas that created a substantial risk of death.

(Tr. Vol. VI, pp. 150-51, 158-60, 184-85, 188-89, 192).

[18] Thereafter, the trial court instructed the jury, in part, on an accomplice liability theory for murder, stating:

> Aiding, inducing or causing Murder is defined by [s]tatute as follows: A person who, knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense. A person may be convicted of aiding, inducing or causing Murder even if the other person has not been prosecuted for Murder, has not been convicted of Murder or has been acquitted of Murder. Before you may convict [Decker] of aiding, inducing or causing Murder, the State must have proved each of the following elements beyond a reasonable doubt: 1. [Decker]; 2. Knowingly or intentionally; 3. Aided, induced or caused; 4. . . . . Evans to commit the offense of Murder, defined as knowingly or intentionally killing . . . Thomas; 5. *By participating in the hitting, kicking, striking and/or stabbing of . . . Thomas.* If the State failed to prove each of these elements beyond a reasonable doubt, you must find [Decker] not guilty of aiding, inducing, or causing Murder, a felony, charged in Count [I].

(Tr. Vol. VI, pp. 197-98) (emphasis added).

[19] When the jury returned a guilty verdict for murder, it is reasonably possible that it did so by relying on the accomplice liability instruction. As the State and the jury instructions both highlighted, a conviction for murder did not require Decker to deliver the fatal stab wound; rather, Decker's participation with Evans throughout the attack—by hitting, stomping, kicking, slamming with a table, and stabbing—was sufficient. Thus, the facts that could have independently supported an aggravated battery conviction were likely also relied on by the jury in convicting Decker of murder. *See Davis*, 770 N.E.2d at 323-24 (Ind. 2002) (vacating an aggravated battery conviction on double

jeopardy grounds where, despite evidence that the victim had been choked and struck in the head, the charging information cited a knife cutting as the basis for both the aggravated battery and attempted murder charges). As such, the two convictions cannot stand. We therefore vacate Decker's conviction for aggravated battery as a Class B felony.

## II. *Prosecutorial Misconduct*

Decker claims that the trial court erred in denying his motion for a mistrial following a statement by the State that purportedly amounted to misconduct. To preserve a claim of prosecutorial misconduct for appeal, "the defendant must—at the time the alleged misconduct occurs—request an admonishment to the jury, and if further relief is desired, move for a mistrial." *Jerden v. State*, 37 N.E.3d 494, 498 (Ind. Ct. App. 2015). Failure to do so results in a waiver. *Id.* In reviewing a claim of prosecutorial misconduct that was properly raised at the trial court level, we must determine "(1) whether misconduct occurred, and, if so, (2) 'whether the misconduct under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected otherwise.'" *Id.* (quoting *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014)). Where a claim of prosecutorial misconduct has not been properly preserved, the general rule is that the claim is waived. *Id.* Nevertheless, a defendant may still prevail by establishing "not only the grounds for prosecutorial misconduct but also that the prosecutorial misconduct constituted fundamental error." *Id.*

[20]     During its rebuttal closing argument, the State addressed some of the discrepancies in witness testimony by stating:

> I think it's important ladies and gentlemen that you look at the physical evidence in this case and[] the testimony that you heard. The physical evidence fits the testimony. What occurred that night fits with the testimony that you heard. Now if everything was exactly alike, the first thing the defense would be up here saying is the State got with all of the witnesses and got them all to say the exactly the same thing.

(Tr. Vol. VI, pp. 189-90). Decker's attorney objected at that point, arguing that it was an "improper comment on my role as an attorney and an insult to me" for the State to suggest that defense counsel would "accus[e] them of having all their witnesses all together." (Tr. Vol. VI, p. 190). The trial court sustained the objection, and Decker's attorney requested both an admonishment to the jury and a mistrial. The trial court denied the motion for a mistrial and admonished the jury "to disregard the statement of the State that uh, that [Decker's attorney] would be arguing that they [somehow] had all of their witnesses uh, get together and testify as the same thing. If, if the, if all the facts were the same." (Tr. Vol. VI, p. 191). Defense counsel thanked the trial court for the admonishment and the State proceeded with its closing statement.

[21]     It is well established that a prosecuting attorney has a "duty to present a persuasive final argument." *Jerden*, 37 N.E.3d at 498. Thus, placing a defendant in grave peril, by itself, is not misconduct." *Id.* Rather, "'[w]hether a prosecutor's argument constitutes misconduct is measured by reference to case

law and the Rules of Professional Conduct. The gravity of peril is measured by the *probable* persuasive effect of the misconduct *on the jury's decision* rather than the degree of impropriety of the conduct.'" *Id.* (quoting *Ryan*, 9 N.E.3d at 667).

[22] Decker contends that the State's argument amounted to misconduct because the prosecutor essentially personally vouched for the witnesses' credibility. Moreover, he claims that the statement subjected him to grave peril "by attacking [his] right to counsel and highlighting the disparate roles of prosecuting and defense attorneys. The State intimated that the jury did not need to be particularly concerned with any discrepancies in the evidence or witness accounts because defense counsel would attack the evidence regardless." (Appellant's Br. p. 15). However, Decker acknowledges that, upon his counsel's request, the trial court issued an admonishment to the jury, and an adequate "admonishment is presumed to cure any error that may have occurred." *Emerson v. State*, 952 N.E.2d 832, 840 (Ind. Ct. App. 2011), *trans. denied*. Thus, Decker now insists that the trial court's admonishment was inadequate to remedy the State's conduct. Specifically, Decker argues that

> [r]ather than addressing trial counsel's concern associated with vouching or reasserting to the jury that Decker has a constitutional right to counsel and to present a defense, [the trial court] curtly and only addressed the State's characterization of a possible defense. Accordingly[,] [t]he trial court's admonishment was inadequate and did not squarely address the issue raised by trial counsel or advise the jury that the State through its prosecutor cannot personally vouch for a witness or witnesses.

(Appellant's Br. p. 16). Decker contends that the trial court should have granted a mistrial. We disagree.

[23] Where an admonishment is insufficient to cure the error, the defendant "must request a mistrial." *Thomas v. State*, 9 N.E.3d 737, 742 (Ind. Ct. App. 2014). Decker moved for a mistrial in conjunction with his objection and request for admonishment based on purported misconduct. Once the admonishment was administered, Decker's attorney thanked the trial court and sought no further relief from any perceived inadequacy in the admonishment. Thus, as the State points out, Decker has waived his right to challenge the adequacy of the admonishment on appeal. *See Etienne v. State*, 716 N.E.2d 457, 461 (Ind. 1999).

[24] Waiver notwithstanding, we find no merit in Decker's claim that the admonishment was inadequate. The trial court did exactly as Decker requested and instructed the jury to entirely disregard the State's assertion that Decker's counsel would have accused the witnesses of conferring if all of their testimonies had completely aligned. Furthermore, while Decker's counsel noted that he felt personally insulted by the State's assumption, nowhere in his objection did he mention the "concern associated with vouching or . . . a constitutional right to counsel and to present a defense" that he now claims. (Appellant's Br. p. 16). Additionally, based on the overwhelming evidence of Decker's guilt, we cannot say that the State's statement placed Decker in a position of grave peril to which he would not otherwise have been subjected. Accordingly, we find that the trial court's admonishment cured any error from the alleged misconduct by the State, and Decker was not entitled to a mistrial.

### III. *Sufficiency of the Evidence*

[25]    Decker claims that the State presented insufficient evidence to sustain his murder conviction. Our court adheres to a well-settled standard of review for claims concerning the sufficiency of evidence. Namely, we do not reweigh evidence or assess the credibility of witnesses, "and we respect the jury's exclusive province to weigh conflicting evidence." *Roberts v. State*, 894 N.E.2d 1018, 1029 (Ind. Ct. App. 2008), *trans. denied*. We will consider only the probative evidence and any reasonably-derived inferences in support of the verdict. *Id.* "If the probative evidence and reasonable inferences drawn therefrom could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt, we must affirm the conviction." *Id.*

[26]    "A person who . . . knowingly or intentionally kills another human being[] . . . commits murder, a felony." I.C. § 35-42-1-1(1). In this case, Decker argues only that the State presented insufficient evidence of his intent to kill Thomas. Decker points out that the evidence established that Thomas was stabbed three times, with only one of the stab wounds proving to be fatal. Thus, although both Decker and Evans admitted to stabbing Thomas, he contends that "there is no evidence indicating which stab wounds are attributable to Decker or whether he was responsible for one or two." (Appellant's Br. p. 18). He generically adds that "the evidence is devoid of any evidence that Decker or Evans intended to kill Thomas or deliberately used a knife in a manner likely to cause death or serious injury." (Appellant's Br. p. 18). "[W]hile the evidence demonstrates that Thomas was fatally stabbed, the State failed to provide little,

if any, evidence concerning the nature and circumstances of how and when he was stabbed." (Appellant's Br. p. 18). Again, we disagree.

[27] We first note that "the requirement of a 'specific intent to kill' applies only in attempted murder cases, and not in murder cases where 'the defendant may be convicted upon a showing of *either* an intentional or knowing killing.'" *Garrett v. State*, 714 N.E.2d 618, 622 (Ind. 1999). A knowing killing requires a showing that "the defendant 'was aware of a high probability that someone's death would result from his actions. Because knowledge is the mental state of the actor, the trier of fact must resort to reasonable inferences of its existence.'" *Leonard v. State*, 73 N.E.3d 155, 160 (Ind. 2017) (quoting *Young v. State*, 761 N.E.2d 387, 389 (Ind. 2002)). Moreover, "[a] knowing killing may be inferred from the use of a deadly weapon in a way likely to cause death.'" *Id.* (quoting *Young*, 761 N.E.2d at 389).

[28] We find a record replete with evidence that Decker was aware of a high probability that Thomas' death would result from his actions. Decker *repeatedly* punched, kicked, and stomped on the head of a man who was already in a near-comatose state due to alcohol. Despite the victim's repeated pleas for Decker to stop the attack, Decker slammed a forty-to-fifty-pound solid wood table down on Thomas' head. Even when Thomas was clearly unconscious, Decker continued to kick and stomp his head and torso. Decker and his co-defendant stabbed Thomas three times, and while only one proved to be fatal, the other two wounds were targeted to areas of obvious vital importance—*i.e.*, the chest and spine. Decker unsuccessfully attempted to drag Thomas' body to a vehicle

to remove it from Jones' yard, but when the police arrived, he changed his blood-stained shirt and fled. He subsequently admitted to multiple people that he had stabbed Thomas and thought that he might have killed him. Upon learning that Thomas had, in fact, succumbed to his injuries, Decker conceded, "[M]an I fucked up." (Tr. Vol. VI, p. 92). Therefore, we find that the State presented sufficient evidence of Decker's culpability to support his murder conviction.

## CONCLUSION

Based on the foregoing, we conclude that Decker's convictions for murder and aggravated battery run afoul of Indiana's double jeopardy prohibition; therefore, we vacate his conviction for Class B felony aggravated battery. However, we affirm Decker's conviction for murder based on our conclusions that any perceived misconduct by the State was cured by the trial court's admonishment with no need for a mistrial, and the State presented sufficient evidence that Decker knowingly or intentionally killed Thomas.

Affirmed in part and reversed in part.

Robb, J. & Pyle, J. concur