**John M. NORRIS, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 64A05–1003–CR–168.**

Court of Appeals of Indiana.

Jan. 31, 2011.

Transfer Denied May 26, 2011.

G. Anthony Bertig, Bertig & Associates, LLC, Valparaiso, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Nicole M. Schuster, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

John M. Norris appeals his conviction for the murder of his long-term live-in girlfriend Elizabeth Lepucki. He argues that the trial court erred in refusing to instruct the jury on involuntary manslaughter as a lesser included offense of

murder and that the evidence is insufficient to support his murder conviction. Because the charging information alleges only a knowing or intentional killing and does not assert a battery, involuntary manslaughter is not a factually included lesser offense of murder. Therefore, the trial court did not err in refusing to instruct the jury on involuntary manslaughter. In addition, based on the significant trauma to Elizabeth's head, the sheer number of injuries to her body, and Norris's actions after the injuries to Elizabeth, we conclude that the evidence is sufficient to prove that Norris knowingly or intentionally killed Elizabeth. We therefore affirm the trial court.

**Facts and Procedural History**

Norris and Elizabeth lived together in Valparaiso, Indiana, and had been dating for approximately six years. Around 2:00 p.m. on June 18, 2008, Elizabeth finished her shift as a nursing assistant at The Willows and had a coworker drive her home. Elizabeth had no injuries at the time.

Norris arrived home around 4:00 p.m. but soon left for a nearby convenience store to buy a pack of cigarettes. While there, he encountered a stranger, Isaac Victory, from Colorado. Isaac needed to use a phone. But because Norris did not have a cell phone, he invited Isaac back to his house to use the landline phone. Isaac brought a twelve-pack of beer with him.

When Norris and Isaac arrived home, Elizabeth began flirting with Isaac because she wanted his beer. Elizabeth drank about five of the beers, and Isaac drank about three. Meanwhile Norris drank vodka. Norris went to the restroom a couple of times while Isaac was there, leaving Elizabeth and Isaac alone. One time, Norris returned to find Elizabeth kissing Isaac. At that point, Norris told the stranger Isaac it was time to go. Isaac left without incident.

At 5:50 a.m. the following morning, Norris called the director of nursing at The Willows and said that Elizabeth had been in a car accident the day before and even though Elizabeth had been treated and released, he had found her unresponsive and was taking her back to the hospital. At approximately 6:34 a.m., Norris called 911. Paramedics arrived around 6:44 a.m. and found Elizabeth unconscious with "obvious bruises, contusions and injury about her face and neck." Tr. p. 182. Elizabeth's left eye was swollen shut, and her pupils were nonreactive and dilated. Norris spoke with Valparaiso Police Department Officer Robert Fisher on the scene. According to Officer Fisher, Norris was "clean and orderly, as if he just got out of the shower and cleaned up." *Id.* at 195. Norris was also "a little shaken and concerned." *Id.* Norris told Officer Fisher that when Elizabeth came home the night before, she nudged him, he woke up, and they had "quickie" sex. *Id.* Norris then rolled back over and went to sleep. Norris said that when he woke up that morning, he could not wake Elizabeth up, so he called 911. Elizabeth was transported to Porter Hospital.

When Elizabeth arrived at Porter Hospital around 8:00 a.m., Nurse Jean Ault, who had specialized training in treating victims of sexual assault, examined Elizabeth and documented the bruising to her body. Elizabeth "had a lot of bruising around her face. Mostly on the left side and she had multiple bruising on arms and then some bruising on her leg and ... right hip." *Id.* at 256. Of particular concern to Nurse Ault was the fingertip bruising to Elizabeth's forearms, which is consistent with being held down. A CT scan was performed.

Based on the severity of Elizabeth's brain injury, she was transported by helicopter to the neurological intensive care unit at The University of Chicago Medical Center, where Dr. Jeffrey Frank, who specializes in neurology, neuro critical care, and vascular neurology, assessed Elizabeth around 11:00 a.m. He concluded that Elizabeth suffered a traumatic brain injury which caused a devastating right subdural hematoma. Dr. Frank opined that the amount of trauma was "[s]ignificant," meaning "people don't get this from a minor hit on the head . . . this happens from significant trauma such that the brain gets jarred inside the skull." *Id.* at 385. According to Dr. Frank, Elizabeth "was dying and there was nothing we could do to salvage her. [S]he was on a rapid spiral toward death." *Id.* at 366. The only care the hospital could offer was palliative for family support purposes. Dr. Frank summarized the cause of that rapid spiral toward death as an "acute subdural hematoma from trauma and the pressure it put on the brain underneath, the way it caused a loss of blood flow to the brain underneath and the way the brain swelled and caused high brain pressures." *Id.* at 367. Based on the 8:00 a.m. CT scan taken at Porter Hospital, Dr. Frank opined that the injury to Elizabeth's brain occurred twelve hours earlier. *Id.* at 392. After a series of tests, Elizabeth was pronounced dead at 9:37 p.m. and taken off all life support machines.

Dr. Michelle Jorden from the Cook County Medical Examiner's Office performed the autopsy. Dr. Jorden noted forty-six external injuries, although she conceded some of them were old, and even more internal injuries. *Id.* at 431, 473, 482–83. Dr. Jorden did not find any fractures to Elizabeth's body, any injuries to Elizabeth's vaginal area, or any evidence of strangulation. Dr. Jorden noted that Elizabeth demonstrated bruising to both sides of her head and in particular to both ears, which caused her to conclude that the trauma to Elizabeth was the result of an assault rather than a fall. Dr. Jorden found three impact sites to Elizabeth's head: left forehead and both ears. *Id.* at 455. Dr. Jorden measured Elizabeth's subdural hematoma at 112 grams; hematomas are fatal at 50 grams. *Id.* at 463–64. Nevertheless, Dr. Jorden explained that the size of the hematoma does not have any relationship to the amount of force which caused it. *Id.* at 476. In fact, Dr. Jorden opined that people can develop a subdural hematoma from relatively minor impact, such as hitting a dresser. *Id.* at 481. Dr. Jorden determined that Elizabeth's cause of death was a subdural hematoma caused by blunt force trauma to the head. *Id.* at 466. Dr. Jorden classified the death as a homicide. *Id.*

While Elizabeth was at Porter Hospital and The University of Chicago Medical Center, Norris was being questioned by Detective John Ross from the Valparaiso Police Department. For the first six hours of the interview, Norris told Detective Ross that he did not know the cause or source of Elizabeth's injuries. Norris repeated the story that Elizabeth had gone out with a friend the night before. However, after Detective Ross told Norris that Elizabeth was probably not going to live, Norris became very upset. As Detective Ross described:

> He appeared to get very emotional and very upset, appeared to be crying, hyperventilating, coughing, wrenching like he was going to vomit or throw up. This went on for approximately an hour and during that timeframe I never noticed any tears come out of his eyes.

*Id.* at 328. Norris then told Detective Ross that he "did this to [Elizabeth]. That he had killed her." *Id.* Specifically, Norris said that he slapped or "cracked" Eliza-

beth in the face when she told him that she kissed Isaac because Isaac was younger than him. State's Ex. 12JN2, p. 9, 32. Elizabeth then took the bottle of vodka with her into the bedroom and drank it, and Norris followed. When Elizabeth made a couple of comments about having sex with whomever she wanted, Norris slapped her again in the face, at which point she turned and fell and hit her head on the side of the dresser and the wall. *Id.* at 9, 34, 61. Norris said that when Elizabeth hit the wall, her head left a hole in the wall. *Id.* at 9, 11, 36. Norris then put Elizabeth in bed, and she was "okay." *Id.* at 9. "She sat up several times and talked to me; and then [after wrestling around some more] we had sex." *Id.* at 9. Norris said that he did not intend to hurt or kill Elizabeth. *Id.* at 52, 65. Norris explained, "[M]y baby girl is in the hospital dying because of me, because of a stupid kiss because of a dumb argument, because we're both fu* *ing hard heads; and that's part of the sick excitement and the bizarre fashion of our relationship is the physicalness." *Id.* at 53.

Norris said that when he hit Elizabeth, he used the palm of his hand. Pictures were taken of Norris's hands, and there was a large bruise to the inside of his right wrist. Tr. p. 332. A subsequent search of the apartment revealed two indentations in the bedroom wall: one eleven inches from the floor and another five feet seven inches from the floor. *Id.* at 291. According to Norris, the only indentation connected to this case is the one eleven inches from the floor. *See* Appellant's Br. p. 29 n. 18.

The State charged Norris with murder. A jury trial was held during which the videotape of Norris's approximately eight-hour statement to Detective Ross was played for the jury. Near the end of trial, Norris filed his second request for jury instructions. The trial court refused Nor-

ris's proposed instructions on involuntary manslaughter as a lesser included offense of murder and then the pattern instructions on involuntary manslaughter as a lesser included offense of murder because it found that there was no serious evidentiary dispute that Norris intended to kill Elizabeth:

> [THE STATE]: Judge, this does turn on a factual interpretation that's up for the jury to decide. I think what the defense is asking you to do is give the jury a compromise, a way out. If their whole case is based on intent, then they can argue that with regard to the murder. The State charged murder because we believe that's what it is. It was more than one blow. What the medical expert testified to, I think, can certainly be interpreted in a manner differently than Mr. Truitt proposed. And I think, in fact, what they did say was that there was substantial trauma and significant injury. So we think that based on the facts and circumstances of this case and the evidence that was put forth, involuntary is absolutely inappropriate.
>
> \* \* \* \* \* \*
>
> THE COURT: . . . I had quite a bit of free time during the statement that was played and, of course, I have the internet up there and LexisNexis and I spent probably two to three hours doing some research on that. And the three areas that they talk about is the all or nothing area where they say by God this is murder and that's all we're going to do. We're going to go with that and nothing else. And if both parties agree with that, it's up to me, as the judge, to determine whether or not that's a trial strategy. If it comes out that that is a trial strategy, then that's not going to be reserved. However, if the State files a charge of murder, as an example here, and the defense team wants a lesser

included instruction and if they submit that instruction to the Court, then the Court has to consider it and give it in some form. I note that you have submitted both involuntary and a voluntary lesser included.

Now, there appears to me to be enough evidence there to indicate some sudden heat, the kiss in the apartment and whatever went on after that to show it.[1] The evidence also, based on what the doctors and the police officers said and the pictures that were introduced, there's enough evidence to show that this was a very severe beating and while she may have struck her head on something—there were double—that one picture with the hole wall, where there's a hole in the wall, there's several other there from the beatings they were in.

\* \* \* \* \* \*

THE COURT: There—you're talking here about an instruction that's relative basically to intent. The State, from what I can tell on this, says yes. But the statute says it's knowingly or inten[t]ionally. That disjunctive, not conjunctive and they're entitled—and they are entitled to go on that. Now, all of that being said, it's possible that instruction should be given. And I want you to tell me why I shouldn't give it, [State].

\* \* \* \* \* \*

[THE STATE]: I think that, you know, particularly in a case where there was one blow to the head, and for this case, where this is a severe beating to be equated to that, is unreasonable. That is not the fact and the circumstance that we have here. If we had had one blow, that would make sense, an involuntary would make sense because he intended

the battery. But I think what you can find from the evidence is that it was more than just an intent to commit a battery. I think that the evidence shows he intended to kill her and not only based on the holes in the wall and, you know, what the medical experts have testified to and even what the defendant has admitted to in his statement, the fact that he slapped her does not equate to the injuries that she had. I think that to let the jury come to a compromise is irresponsible.

\* \* \* \* \* \*

THE COURT: I'm not going to give it.

Jury Instruction Arguments Tr. p. 12, 13–15, 15, 16, 18; *see also id.* at 20–21.

Although no jury instructions on involuntary manslaughter were submitted to the jury, defense counsel argued during closing argument that Norris was guilty of involuntary manslaughter, not murder, and then read the elements of involuntary manslaughter to the jury. Defense counsel also argued that the State should have charged the crime as involuntary manslaughter. If the jury agreed with defense counsel's argument, then it could have acquitted Norris of murder. The jury, however, found Norris guilty of murder. The court sentenced him to sixty-five years, with ten years suspended to probation. Norris now appeals.

### Discussion and Decision

Norris raises two issues on appeal. First, he contends that the trial court erred in refusing to instruct the jury on involuntary manslaughter as a lesser included offense of murder. Second, he contends that the evidence is insufficient to support his murder conviction.

1. Although the jury was instructed on voluntary manslaughter, according to Norris, "[he] never seriously argued voluntary manslaugh- ter since it was not supported by the evidence, nor did Norris intentionally kill [Elizabeth]." Appellant's Reply Br. p. 6.

## I. Involuntary Manslaughter

Norris contends that the trial court erred in refusing to instruct the jury on involuntary manslaughter as a lesser included offense of murder. The State responds that involuntary manslaughter is not a lesser included offense of murder in this case based on the way it chose to charge murder. Appellee's Br. p. 9.

 In determining whether to give a lesser included offense instruction, trial courts apply the three-part test set forth in *Wright v. State*, 658 N.E.2d 563 (Ind. 1995):

> First, a trial court must compare the statute defining the crime charged with the statute defining the alleged lesser included offense. If (a) the alleged lesser included offense may be established by proof of the same material elements or less than all the material elements defining the crime charged, or (b) the only feature distinguishing the alleged lesser included offense from the crime charged is that a lesser culpability is required to establish the commission of the lesser offense, then the alleged lesser included offense is *inherently* included in the crime charged....
>
> Second, if a trial court determines that an alleged lesser included offense is not inherently included in the crime charged under step one, then it must compare the statute defining the alleged lesser included offense with the charging instrument in the case. If the charging instrument alleges that the means used to commit the crime charged include all of the elements of the alleged lesser included offense, then the alleged lesser included offense is *factually* included in the crime charged....
>
> Third, if a trial court has determined that an alleged lesser included offense is *either* inherently *or* factually included in the crime charged, it must look at the evidence presented in the case by both parties. If there is a serious evidentiary dispute about the element or elements distinguishing the greater from the lesser offense and if, in view of this dispute, a jury could conclude that the lesser offense was committed but not the greater, then it is reversible error for a trial court not to give an instruction, when requested, on the inherently or factually included lesser offense.

*Id.* at 566-67 (citations, quotation, and footnote omitted).

A person commits murder when he knowingly or intentionally kills another human being. Ind.Code § 35–42–1–1(1). A person commits Class C felony involuntary manslaughter when he kills another human being while committing battery. *Id.* § 35–42–1–4(c)(3). The defendant's intent—the intent to kill or the intent to batter—distinguishes murder from involuntary manslaughter. *Wilson v. State*, 765 N.E.2d 1265, 1271–72 (Ind.2002). Here, the charging information alleges that **"John M. Norris** did on or about the 18th day of June, 2008, in the county of Porter, State of Indiana, knowingly or intentionally kill another human being, to-wit: Elizabeth A. Lepucki....." Appellant's App. p. 31.

It is undisputed that involuntary manslaughter is not an inherently lesser included offense of murder. *Roberts v. State*, 894 N.E.2d 1018, 1029 (Ind.Ct.App. 2008), *trans. denied; Ketcham v. State*, 780 N.E.2d 1171, 1177 (Ind.Ct.App.2003), *trans. denied.* It may, however, be factually included if the charging information alleges that a battery accomplished the killing. *Ketcham*, 780 N.E.2d at 1177; *see also Wright*, 658 N.E.2d at 567 ("If the charging instrument alleges that the means used to commit the crime charged include all of the elements of the alleged

lesser included offense, then the alleged lesser included offense *is factually* included in the crime charged. . . .").

The *Wright* Court discusses the circumstances in which the State may foreclose an instruction on a lesser included offense. The Court observes, "[T]he State cannot draft an information that forecloses an instruction on an inherently lesser included offense of the crime charged." *Wright*, 658 N.E.2d at 569. "What is clear, however, . . . is that the State may only foreclose instruction on a lesser offense that is not inherently included in the crime charged by omitting from a charging instrument factual allegations sufficient to charge the lesser offense." *Id.* at 570; *see also Jones v. State*, 438 N.E.2d 972, 975 (Ind.1982) ("By the same token, the state through its drafting can foreclose as to the defendant, the tactical opportunity to seek a conviction for a lesser offense. The point is that absolute discretion rests in the state to determine the crime(s) with which a defendant will be charged.").

 Norris was charged with only knowingly or intentionally killing another human being.[2] The charging information contains no reference to a battery that could have been a basis for an involuntary manslaughter instruction. Contrary to Norris's assertion that the State's drafting

of the information lacked detail, the State was within its discretion to draft the information in a manner that foreclosed the opportunity for Norris to seek a conviction on a lesser offense. *See Roberts*, 894 N.E.2d at 1029. Although Norris directs us to the probable cause affidavit for a description of the method of the alleged murder,[3] it was within the State's discretion to determine the manner in which it would proceed against Norris. *See id.* Accordingly, the trial court properly rejected Norris's involuntary manslaughter instruction. *See id.;* see also *Champlain v. State*, 681 N.E.2d 696, 702 (Ind.1997) (because the charging information alleged only a knowing killing and did not assert a battery, involuntary manslaughter was not a factually included lesser offense of murder; therefore, the trial court did not err in refusing to give the instruction). And contrary to Norris's argument on appeal, it does not matter that the court needlessly advanced to step three of the *Wright* test and concluded that there was no serious evidentiary dispute that Norris intended to kill Elizabeth. Based on the State's drafting of the murder charge, instruction on involuntary manslaughter was foreclosed in this case.

## II. Sufficiency of the Evidence

 Norris contends that the evidence is insufficient to support his murder

---

2. Norris argues on appeal that the fact that he was charged with a knowing *or* intentional killing distinguishes this case from *Roberts*, which is on all fours with this case except for the fact that Roberts was charged with only a knowing killing. We find that the fact that Roberts was not alternatively charged with an intentional killing does not affect the analysis of that opinion and therefore has no bearing on this case.

3. Although Norris asserts fundamental error because the charging information does not allege battery as the means of murder, as we explain above, the drafting of the charging information is left to the discretion of the

State. To the extent Norris claims he was not adequately advised of the charge, even where a charging instrument may lack appropriate factual detail, additional materials such as the probable cause affidavit supporting the charging instrument may be taken into account in assessing whether a defendant has been apprised of the charges against him. *See Patterson v. State*, 495 N.E.2d 714, 719 (Ind.1986); *see also* 5 Wayne R. LaFave et al., *Criminal Procedure* § 19.3(b) (3d ed.2007). Finally, Norris himself states in his brief that he "already knew" that "the death was a result of a battery." Appellant's Br. p. 20. There is thus no fundamental error.

conviction. When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences supporting the verdict. *Drane v. State,* 867 N.E.2d 144, 146 (Ind.2007). It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. *Id.* To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it "most favorably to the trial court's ruling." *Id.* Appellate courts affirm the conviction unless "no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Id.* at 146–47 (quotation omitted). It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. *Id.* at 147. "[T]he evidence is sufficient if an inference may reasonably be drawn from it to support the verdict." *Id.* (quotation omitted).

As noted above, the State charged Norris with knowingly or intentionally killing Elizabeth. "A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so." Ind.Code § 35–41–2–2(a). "A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." *Id.* § 35–41–2–2(b). Intent and knowledge may be proved by circumstantial evidence and inferred from the circumstances and facts of each case. *Heavrin v. State,* 675 N.E.2d 1075, 1079 (Ind.1996), *reh'g denied.* Also, one is presumed to have intended the reasonable results of his or her own acts. *Id.*

■ The evidence shows that Elizabeth died from a subdural hematoma caused by blunt force trauma to the head. According to Dr. Jorden, Elizabeth had bruises to both ears, a large bruise on her left forehead, a large bruise around her left eye, and a bruise around her right eye. Elizabeth had three impact sites to her head: left forehead and both ears. Dr. Frank described the amount of trauma to Elizabeth as "significant," meaning "people don't get this from a minor hit on the head … this happens from significant trauma such that the brain gets jarred inside the skull." Tr. p. 385; *see also id.* at 481 (Q: Did you see what you would consider to be minor impact on Elizabeth Lepucki when you examined her [during the autopsy]? A [by Dr. Jorden]: "No."). Although Norris claimed that he "just" slapped Elizabeth, following which her head hit the dresser and the wall, leaving a hole in the wall, *see* State's Ex. 12JN2, p. 51 ("I just slapped her."), 17 ("How can somebody die from being slapped? It's not possible. It's not possible. It doesn't seem possible."), Elizabeth had forty-six external injuries, though some of them were old. In addition, Norris had a large bruise on the inside of his right wrist.

As Norris highlights, Dr. Frank testified that a period of lucidity can sometimes follow an initial blow which causes a subdural hematoma. Norris says that it was during this period of lucidity that he and Elizabeth wrestled some more and then engaged in consensual sexual intercourse (which they often do), following which Elizabeth went to sleep. Dr. Frank, however, explained that such periods of lucidity are rare and more common is a rapid degrade. Although Norris's seminal fluid was found inside Elizabeth and Elizabeth had no injuries to her vaginal area, the timing of their sexual intercourse was not fixed at trial.

Finally, it was established that the injury to Elizabeth's brain occurred around 8:00 p.m. shortly after Isaac left, yet Norris did not seek medical care for her. When Elizabeth would not arouse the fol-

lowing morning for her 6:00 a.m. nursing shift, Norris still did not promptly seek medical care for her. Instead, Norris called Elizabeth's employer and lied about her being in a car accident. When Elizabeth still would not wake up after Norris applied some wet cloths to her face, Norris finally called 911. When emergency personnel responded, Norris again lied about Elizabeth's whereabouts the night before. And when Norris met with Detective Ross, he denied knowing anything about the cause of Elizabeth's injuries for the first six hours of their interview. It was only after Detective Ross informed Norris of the gravity of Elizabeth's condition that Norris took responsibility for Elizabeth's condition (yet denied any intent to kill her).

Based on the significant trauma to Elizabeth's head, the sheer number of injuries to her body, and Norris's actions after the injuries to Elizabeth, we conclude that the evidence is sufficient to prove that Norris knowingly or intentionally killed Elizabeth. We therefore affirm the trial court.

Affirmed.

MAY, J., and ROBB, C.J., concur.