Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 23 2012, 9:26 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**LORINDA MEIER YOUNGCOURT**
Bedford, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**RICHARD C. WEBSTER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| BRIAN C. HOSTETLER, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 47A05-1112-CR-659 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE LAWRENCE SUPERIOR COURT
The Honorable Michael A. Robbins, Judge
Cause No. 47D01-1103-FC-259

**August 23, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

## STATEMENT OF THE CASE

Appellant-Defendant, Brian C. Hostetler (Hostetler), appeals his conviction for battery by means of a deadly weapon, a Class C felony, Ind. Code § 35-42-2-1(a)(3).

We affirm.

## ISSUE

Hostetler raises one issue on appeal, which we restate as follows: Whether the State produced sufficient evidence to prove beyond a reasonable doubt that he committed battery by means of a deadly weapon.

## FACTS AND PROCEDURAL HISTORY

On February 7, 2011, Kyle Smith (Smith) of Smith Bonding Services in Hendricks County, Indiana issued an appearance bond for fifteen hundred dollars to Hostetler in order to insure Hostetler's appearance in court concerning a charge of resisting law enforcement. On March 2, 2011, the day of Hostetler's scheduled court appearance, Smith received a phone call from the Hendricks County Circuit Court informing him that Hostetler had failed to appear as scheduled and that if he did not produce Hostetler, the bond would be forfeited. When Smith investigated Hostetler's failure to appear, Hostetler's father told him that he had recently received a call from Hostetler in which Hostetler had asked him if there were any bus companies in Bedford, Indiana. Based on this information, Smith drove to Bedford to look for Hostetler.

Once Smith reached Bedford, he discovered that there were no bus companies operating there, so he decided to drive around the major roads to see if he could find

Hostetler. After about an hour, Smith spotted Hostetler on the side of State Road 37 wearing coveralls and a beanie and holding a sign that said "Florida." (Transcript p. 189). Smith pulled over and Hostetler asked who he was. Smith replied "I'm your bondsman, [Smith]." (Tr. p. 189). In response, Hostetler "immediately jumped over a rail on the side of the bridge down to a rocky culvert area." (Tr. pp. 189-90). Smith started to follow Hostetler, but noticed that Hostetler was pulling a hammer out of his coveralls. Smith asked Hostetler if he had a gun, and he replied that he did not. Nevertheless, Smith returned to his car and called 911.

Four or five minutes later, Bedford Police Officers David Booth (Officer Booth) and Kye Louden (Officer Louden) arrived at the scene and talked to Smith. Officer Booth jumped over the guardrail towards Hostetler and Officer Louden stayed with Smith to verify that he had a warrant for Hostetler's failure to appear. After verifying Smith's warrant, Officer Louden left to assist Officer Booth.

As Officer Booth approached Hostetler, Hostetler started to walk away. Officer Booth told Hostetler to stop and informed him that he was a police officer. Hostetler pulled the hammer out of his overalls again and continued to walk away. Officer Booth continued to verbally command Hostetler to stop, but Hostetler continued to walk away at a "hurried pace" and "yelled a few times." (Tr. p. 224). Officer Booth ran to catch up with Hostetler, and Hostetler stopped and put the hammer above his head. Officer Booth turned on his taser and informed Hostetler that he would tase him if he did not drop the hammer. Hostetler responded "that doesn't work on me[.] I've been tased ten times . . . .

3

[Y]ou're gonna have to shoot me." (Tr. p. 225). Officer Booth fired his taser at Hostetler, but the taser was not effective and Hostetler raised his hammer again. As a result, Officer Booth holstered his taser and pulled out his gun, telling Hostetler that he would shoot if he did not drop the hammer. Hostetler stood his ground and yelled "you're going to have to shoot me." (Tr. p. 226). Officer Booth continued to tell Hostetler to drop his hammer, but Hostetler turned around and started to walk away without dropping his hammer.

At that point, Officer Booth heard Officer Louden approaching, and signaled to him to approach Hostetler from a different angle in order to cut him off. Both Officers continued to follow Hostetler, and shortly thereafter another police officer, Officer John Ritter (Officer Ritter), arrived and approached Hostetler from a third angle. As they walked, every now and then Hostetler would raise his hammer above his head and tell the Officers to get away from him. The Officers also attempted to move in towards Hostetler. Whenever they closed in on him, though, he would approach an Officer with the hammer above his head, and that Officer would have to move back. The Officers kept attempting to move in until an additional Officer arrived and there were four total Officers surrounding Hostetler.

The four Officers and Hostetler stopped and the Officers attempted to convince Hostetler to drop his hammer. After a minute, Officer Ritter moved towards Hostetler and deployed his taser. The taser was effective for a moment and Hostetler fell backwards. Once he hit the ground he "immediately . . . [came] back up swinging the

4

hammer again." (Tr. p. 233). Officer Louden knocked Hostetler backwards again and tried to jump on top of him. While doing so, Hostetler struck Officer Louden in the side with the hammer and the two began to roll down a hill. The other Officers rushed in and tackled Hostetler. However, Hostetler would not give them his hands, so Officer Louden kicked him in his outer thigh area, after which the Officers were able to handcuff Hostetler.

On March 4, 2011, the State filed an Information charging Hostetler with Count I, battery by means of a deadly weapon, I.C. § 35-42-2-1(a)(3), a Class C felony; Count II, resisting law enforcement, I.C. §§ 35-44-3-3(a)(1), -(b)(1)(B), a Class D felony; and Count III, battery resulting in bodily injury, I.C. § 35-42-2-1(a)(2)(A), a Class D felony. On September 26-27, 2011, a jury trial was held. The jury found Hostetler guilty of Counts I and II, but not guilty on Count III. On November 28, 2011, the trial court sentenced Hostetler to four years incarceration for Count I and one and one half years for Count II, with sentences to be served concurrently.

Hostetler now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

Hostetler argues that the State did not produce sufficient evidence to prove beyond a reasonable doubt that he committed battery by means of a deadly weapon when he struck Officer Louden with his hammer. The standard of review for a sufficiency of the evidence claim is that this court will only reverse a conviction when reasonable persons would not be able to form inferences as to each material element of the offense. *Perez v.*

5

*State,* 872 N.E.2d 208, 212-13 (Ind. Ct. App. 2007), *trans. denied.* We do not reweigh evidence or judge the credibility of witnesses. *Id.* at 213. In addition, we only consider the evidence most favorable to the verdict and the reasonable inferences stemming from that evidence. *Id.*

In order to establish that Hostetler committed battery by means of a deadly weapon as a Class C felony, the State was required to prove beyond a reasonable doubt that he "knowingly or intentionally touch[ed] another person in a rude, insolent, or angry manner . . . by means of a deadly weapon." I.C. § 35-42-2-1. The Indiana Code defines "deadly weapon" as "a weapon that in the manner it is used; or ordinarily could be used, or is intended to be used, is readily capable of causing serious bodily injury." I.C. § 35-41-1-8(2). The statute defines serious bodily injury as "an injury causing serious permanent disfigurement, unconsciousness, or extreme pain." I.C. § 35-41-1-25. While a hammer is not normally considered a deadly weapon, we have previously held that instrumentalities that are harmless in their general usage may nevertheless be regarded as lethal when utilized in a harmful manner. *Morris v. State,* 266 Ind. 473, 482 (Ind. 1977), *cert. denied,* 98 S.Ct. 526 (1977).

Hostetler's argument on appeal is that he did not have the requisite intent to commit battery by means of a deadly weapon. According to Hostetler, he lost his balance and fell straight back after being hit by the taser and was not capable of knowingly swinging the hammer. He also argues that the hammer would never have come into contact with Officer Louden if he had not tackled Hostetler.

6

I.C. § 35-41-2-2(b) provides that a person engages in conduct "knowingly" if, when he or she engages in the conduct, the person is aware of a "high probability" that he or she is doing so. Because knowledge is a mental state of the actor, it may be proven by circumstantial evidence and inferred from the circumstances and facts of each case. *Smith v. State,* 963 N.E.2d 1110, 1113 (Ind. 2012). We will presume that a defendant intends the reasonable results of his own acts. *Norris v. State,* 943 N.E.2d 362, 370 (Ind. Ct. App. 2011), *trans. denied.*

Here, there is evidence that Hostetler repeatedly brandished his hammer above his head and refused to comply with the Officers' orders to put it down, from which we infer that he was threatening to use the hammer as a weapon. Then, when Officer Ritter tased Hostetler, he hit the ground but "immediately . . . [came] back up swinging the hammer again." (Tr. p. 233). When Officer Louden rushed him, he was still swinging the hammer and he hit Officer Louden with it. From this evidence, it is clear that Hostetler was not too stiff from the taser to swing the hammer. We also infer from this evidence that Hostetler knowingly used the hammer as a deadly weapon. As Hostetler does not otherwise contest his conviction, we accordingly conclude that the State produced sufficient evidence to prove that he committed battery by means of a deadly weapon.

## CONCLUSION

Based on the foregoing, we conclude that the State produced sufficient evidence to prove beyond a reasonable doubt that Hostetler committed battery by means of a deadly weapon.

7

Affirmed.

BAILEY, J. and CRONE, J. concur