

FILED

Nov 09 2020, 8:32 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Stacy R. Uliana
Jack Kenney
Bargersville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Justin F. Roebel
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| John B. Larkin,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | November 9, 2020<br><br>Court of Appeals Case No.<br>19A-CR-2705<br><br>Appeal from the LaPorte Superior<br>Court<br><br>The Honorable Roger Bradford,<br>Special Judge<br><br>Trial Court Cause No.<br>46D01-1212-FA-610 |

**Brown, Judge.**

[1] John B. Larkin appeals his conviction and sentence for involuntary manslaughter, raising several issues. We reverse.[1]

## Facts and Procedural History

[2] This is the third appeal in this case. In December 2012, police were dispatched to the home of John and Stacey Larkin for a reported shooting. *State v. Larkin*, 100 N.E.3d 700, 701 (Ind. 2018), *reh'g denied*. Stacey sustained two fatal gunshot wounds during a domestic dispute. *Id*. Police took Larkin into custody for questioning and interrogated him even after he invoked his right to counsel. *Id*. at 701-702. Larkin's statements to police during those sessions were later suppressed. *Id*. at 702. On December 13, 2012, the State charged him with voluntary manslaughter as a class A felony,[2] and police conducted a recorded interview. *Id*.

> During a break, police left Larkin alone with his attorney, but kept the video recording equipment running, capturing Larkin and his attorney's privileged communications. Larkin and his attorney discussed various aspects of the case including insurance, motivation and motive, possible charges, filing for divorce, the children, conditions of bond, the funeral, possible defenses, and the sequence of events on the evening of the shooting. Police and prosecutors

---

[1] We heard virtual oral argument on October 22, 2020. We thank counsel for their well-prepared and engaging oral advocacy.

[2] The charging information stated:

> On or about the 11th day of December, 2012, at . . . Long Beach, LaPorte County, Indiana, JOHN LARKIN, did knowingly or intentionally kill another human being, to-wit: Stac[e]y Simon Larkin; while acting under sudden heat, such killing being committed by means of a deadly weapon, to-wit: a handgun.

Cause No. 46A05-1411-CR-550, Appellant's Appendix I at 37.

viewed the video and, therefore, saw and heard Larkin's privileged discussion with counsel. A court reporter even transcribed the discussion and distributed it to the prosecutor's office. Nearly one year later (December 2013), the State disclosed to Larkin that it had eavesdropped on privileged communications between him and his attorney.

*Id.*

[3] In July 2014, Larkin moved to dismiss the voluntary manslaughter charge citing police and prosecutorial misconduct and later moved to disqualify the LaPorte County Prosecutor's Office and requested a special prosecutor. *Id.* He also filed a motion to dismiss in September 2014 alleging the State's lead detective conspired to obstruct justice by having another officer change his statement regarding that officer's prior interaction with Stacey. *Id.* In October 2014, the court denied Larkin's motions but suppressed statements Larkin made to police after he invoked the right to counsel but before counsel arrived and the recorded conversation between Larkin and counsel. *Id.* Larkin initiated an interlocutory appeal, and this Court dismissed the appeal as moot since LaPorte County elected a new prosecutor in November 2014. *Id.* (citing *Larkin v. State*, 43 N.E.3d 1281, 1286-1287 (Ind. Ct. App. 2015)). The State moved for the appointment of a special prosecutor, which the trial court granted. *Id.*

[4] In May 2016, Larkin moved for discharge under Ind. Criminal Rule 4(C) and to dismiss the voluntary manslaughter charge, arguing the police and prosecutorial misconduct made a fair trial impossible. *Id.* at 703. The trial court ultimately granted Larkin's motions, discharging him pursuant to Rule 4(C) and

dismissing the voluntary manslaughter charge. *Id*. The State appealed, and this Court affirmed. *Id*. (citing *State v. Larkin*, 77 N.E.3d 237 (Ind. Ct. App. 2017), *reh'g denied*, *trans. granted*, *opinion vacated*, 94 N.E.3d 700 (Ind. 2017)). The State sought transfer. *Id*. On June 27, 2018, the Indiana Supreme Court issued a decision which held:

> In this case, there is no dispute that the State committed misconduct and on numerous occasions. First, police continued to question Larkin after he invoked his right to counsel. Then, Larkin's private conversation with his attorney was recorded and listened to by several individuals at the prosecutor's office. The situation was compounded when the conversation was transcribed and further distributed. Additionally, there is evidence in the record reflecting potential evidence tampering. That is, one officer instructed another to change his statement about his prior interaction with Larkin's wife. There is also evidence that a piece of physical evidence, the safe containing the gun used to shoot Stacey, was tampered with while in the State's custody and prior to allowing Larkin an opportunity to examine it.

*Id.* at 706. The Court held that the appropriate remedy for the State's misconduct was suppression of the tainted evidence for which the State could not rebut the presumption of prejudice pursuant to *State v. Taylor*, 49 N.E.3d 1019 (Ind. 2016)). 100 N.E.3d at 706. It also held the Rule 4(C) motion for discharge should have been denied. *Id*. at 707. The Court remanded for further proceedings. *Id*. at 708.

[5] On May 7, 2019, Larkin filed a Motion to Dismiss for State Misconduct alleging that, after the Indiana Supreme Court's decision was issued, he discovered the State withheld material evidence that the gun involved in the

shooting was defective and could discharge even when the safety was engaged or without the trigger being pulled when the gun was dropped or bumped, and he argued the withheld evidence went to the heart of his defense that he accidentally shot Stacey while struggling to keep the gun away from her. The court held a hearing on May 14, 2019.

[6] On July 2, 2019, the court issued an order stating that it had read the transcripts of the questioning of Larkin after he requested an attorney and of the recorded conversation between Larkin and his attorney, which were suppressed, and the transcript of questioning of Larkin by the police and prosecuting attorney in the presence of Larkin's attorney. The court found the State gained no information from the suppressed items that it did not receive in its interview with Larkin when his attorney was present and, "[t]herefore, any such evidence obtained is not tainted." Appellant's Appendix Volume II at 206. The court also stated that, "[a]s to the gun defect, the defense is now fully aware of that and the failure to disclose has no effect on the evidence." *Id*.

[7] The court held a jury trial on September 9 through 13, 2019. The jury heard evidence that in 2012 Larkin and Stacey lived together and had four children who were nine to fourteen years old. The parties entered into a stipulation that Stacey was hospitalized for three days in November 2000 for suicidal gestures and ideations, depression, and anxiety, that she was diagnosed with major depressive disorder, and that records indicate concern over hypomanic behaviors. The parties also stipulated as to the various medications she had been prescribed.

[8] K., Larkin and Stacey's oldest child, testified that she played the role of therapist for her mother, she took care of her mother during the times she dealt with her mental health, medications, and alcohol, and that her mother told her she had placed a gun to her own head three times. K. testified that, in mid-2012, her mother started taking a new medication and her behavior worsened, she would drink alcohol, there were multiple instances where she observed Stacey push or punch Larkin, and she observed Stacey scream and lock herself in her room. K. testified that she would unlock the door using either a key or a knife and enter the bedroom to take care of her mother. She also testified that, when she was younger, she would unlock her mother's computer and read documents in which her mother wrote about her life to make sure that she was okay. K. further indicated there was an incident in June 2012 during which Stacey had taken a gun from the house, threatened suicide, and eventually brought the gun back to the house and handed it to K. K. indicated she gave the gun to Larkin, who placed it in the back of his car. Larkin stated in his police interview it was in the family's storage unit and told Stacey where he placed the gun and that there was no reason to have it in the house.

[9] K. further testified there was an incident the weekend before July 4th during which Larkin told Stacey she could not drive the family home from a festival because she was intoxicated, Stacey screamed, cursed, and ran away, and Larkin found her about thirty minutes later and was able to take her home. K. also testified that, on July 8, 2012, there was a party at their house at which Stacey was intoxicated, she heard Stacey yelling, Stacey struck Larkin and

broke a phone, Larkin called 911, and Stacey started to scratch herself, ran to the garage, told K. to get in the car with her, and drove away with K. K. testified that, while in the vehicle, the police called and told Stacey to turn around, Stacey did a U-turn, while she was intoxicated and K. held the steering wheel, and after they arrived home the police administered field sobriety tests. Stacey was arrested, and Larkin later wrote a letter stating that he did not wish to press charges for any battery by Stacey and that his hope was that she would obtain the assistance she needed. K. testified that, in September 2012, there was a family meeting during which Larkin told Stacey that he wanted her to participate in a treatment program and that, if she did not, he would divorce her. K. also testified that, during the week before she died, Stacey was very angry and was walling herself off, and deleting files from her computer.

[10] Q., another of Larkin and Stacey's children, testified that Stacey became more agitated and depressed as the year 2012 progressed. Q. testified as to Stacey's changing demeanor in the summer of 2012, the incidents in July 2012, and the family meeting in September 2012. Q. testified that the family bought Stacey a birthday cake in September, she threw the cake in the garbage, and started screaming at them. Q. kept a key which unlocked many of the doors in the house and would sometimes unlock the door to Stacey's room to check on her.

[11] An attorney testified that Larkin retained her and she spoke with him in 2011 and 2012 about a dissolution of his marriage and his concerns about Stacey's well-being and the safety of his children in the home with Stacey. She testified that Larkin called her when Stacey took the handgun and left the home and that

she told him that he needed to call the police. She also indicated that, on December 10, 2012, Larkin contacted her and stated he wished to pursue a divorce and desired to file quickly.

[12] The jury heard testimony that, on December 11, 2012, Larkin asked Stacey to dinner. K. testified that her mother was in South Bend, called her, and said she did not want to go to dinner with Larkin. K. testified that Stacey later arrived home, walked directly to her room and into the closet and slammed the door, and that she heard "weird noises like things being thrown around." Transcript Volume IV at 243. She testified that Larkin brought chicken home for the children, and according to Larkin's interview statement, he walked inside with the chicken dinner, and Stacey walked out the door and said "f--- you" and "I'm leaving and I'm never coming back." Exhibits Volume X at 99.[3] A little while later while Larkin and Q. were in the kitchen, Stacey returned to the house. According to Larkin, Stacey walked by and "gave [him] the finger" and walked to their bedroom. *Id*. at 100. Q. testified that he observed Stacey and she "looked like she was determined, like she just looked agitated and . . . determined to do something" and that she "sped-walked" to her room. Transcript Volume V at 23. At some point, Q. unlocked the door to check on her, and Larkin said that he was going to talk with Stacey. According to Larkin, he told Stacey that he had instructed his attorney to file for divorce and

[3] The December 13, 2012 interview was admitted at trial. A transcript of the interview was submitted prior to the May 14, 2019 hearing.

she would not have custody of their children, and that she cursed at him and said he would not get custody.

[13] K. testified that she walked into her parents' bathroom and said she was going to take a shower, her father said "that's fine," and her mother, who was in the closet, started screaming "Get out. Get the hell out." Transcript Volume IV at 245. K. testified she went to another bathroom. Larkin stated that he walked out and told K. not to worry, K. walked away to take a shower, he returned to where Stacey was in the walk-in closet, and he heard a "beep" which he recognized as the biometric safe in the closet being opened. Exhibits Volume X at 113. Larkin indicated only he and Stacey were able to open the safe, and that he saw the butt of the gun and Stacey's facial expression, she reached for the gun and placed her hand on it, and he reached over her, grabbed the gun, and backed up to near the doorway. He reported that he said "[w]hat is your f----- problem" and that she "just had this blank stare." *Id*. at 113-114. Larkin stated that he had believed the gun was in storage and that Stacey must have retrieved it because she was the only other person with a key to the storage unit. He stated that he held the gun but did not point it at Stacey, he looked down at the gun to see if there was a round in it but was unable to do so, he told Stacey that she was going back to jail and he was calling the police, she said "no, no, no, no, you're not doing that," and he said "yes, I am." *Id*. at 121.

[14] Larkin stated that, at that point, Stacey ran or charged at him, he fell sideways and down, Stacey fell as well, and the gun discharged when they went down. He stated he was scared to death when the gun discharged. When asked "you

obviously had your finger on the trigger," Larkin replied: "I was not planning on it, but, yeah." *Id*. at 122. He indicated he did not believe she had been shot. He stated that Stacey "sprung back up" or "popped up" and started to grab his head and scratch his face, he said "stop stop stop" and "no, no, no" and pushed her toward the corner, and "when I came down on her the gun discharged." *Id*. at 114, 123, 126, 148. He stated "I pretty much tried to get her so I could get her to stop [and] she starts scratching my face and I literally just jump on top of her to put her in the corner and I go enough." *Id*. at 125-126. When asked "[s]o you push her into that corner," Larkin answered "I certainly do." *Id*. at 126. He stated "I'm pushing like this and I make – didn't want to lose the gun so I came down and pushed her like that," and the gun discharged. *Id*. When asked if his finger was on the trigger, he stated that he did not know. Stacey did not move, and Larkin immediately called 911.

[15] The jury heard testimony that only female DNA was found on a swab taken from the door of the biometric safe. It also heard testimony that swabs of the gun were taken and Stacey could not be excluded as the minor profile. Larkin stated in his interview that he did not know what Stacey was capable of doing and whether she would want to kill herself or him. The jury heard testimony that Stacey died from the gunshot wounds and that theoretically either wound could have been fatal. It heard that she had one gunshot wound which entered her upper chest and another which entered her left back. It heard testimony, with respect to the wound to her chest, that the muzzle of the weapon was in contact with her sweater which was in contact with her skin when it discharged

and, with respect to the wound to her back, that the muzzle appeared to be in contact with her sweater which was less than one inch and up to a maximum of several inches from her back when it discharged. It heard testimony there were different scenarios in which Stacey could have been shot and one possibility was that she was shot while facing and on top of Larkin. The shot which entered her back was angled downward slightly. Stacey had abrasions on her hands, scratches in multiple locations, and other small bruises or contusions on both her lower and upper extremities. Larkin had approximately a half dozen scratches on his face and a cut to his hand.

[16] The jury also heard testimony that the model of the handgun had been recalled because it could discharge upon impact after being dropped without the trigger being pulled and the trigger could be pulled to fire the gun while the safety appeared to be engaged but was not fully engaged. On September 12, 2019, which was the fourth day of trial, the prosecutor requested the court instruct the jury on the offense of reckless homicide, and after hearing arguments, the court denied the motion.

[17] On September 13, 2019, after the State and defense had rested their cases, the prosecutor requested that the trial court instruct the jury on the offense of involuntary manslaughter. The prosecutor argued: "I think this is factually lesser-included certainly from the evidence. There isn't any question that [Larkin], as he admits, pushed the victim into a corner and surely that is touching in a rude, insolent, or angry manner." Transcript Volume V at 233. Larkin's defense counsel argued the State's charging information did not allege

that Larkin committed voluntary manslaughter by means of a battery and thus the State was foreclosed from seeking an involuntary manslaughter instruction. The court granted the State's request and instructed the jury on the offenses of voluntary manslaughter and involuntary manslaughter.[4]

---

[4] The instruction on voluntary manslaughter stated in part:

> A person who knowingly or intentionally kills another human being while acting under sudden heat commits Voluntary Manslaughter, a Class B Felony. However, the offense is a Class A Felony if it is committed by means of a deadly weapon. . . . Before you may convict the Defendant, the State must have proved each of the following beyond a reasonable doubt:
>
> > 1. The Defendant, John B. Larkin;
> > 2. Knowingly or intentionally;
> > 3. Killed;
> > 4. Stac[e]y Simon Larkin;
> > 5. By means of a deadly weapon.
>
> If the State failed to prove elements 1 through 5 beyond a reasonable doubt, you must find the Defendant not guilty of voluntary manslaughter, a Class A Felony.

Appellant's Appendix Volume IV at 21. The instruction on involuntary manslaughter stated in part:

> . . . . If the State proves the Defendant guilty of Voluntary Manslaughter, you need not consider the included crime. However, if the State fails to prove the Defendant committed Voluntary Manslaughter, you may consider whether the Defendant committed Involuntary Manslaughter.
>
> * * * * *
>
> A person who kills another human being while committing battery commits involuntary manslaughter, a Class C felony.
>
> Before you may convict the Defendant, the State must have proved each of the following elements:
>
> > 1. The Defendant, John Larkin
> > 2. killed, Stac[e]y Simon Larkin, a human being
> > 3. while committing battery, which is defined as follows:
> > 4. knowingly or intentionally
> > 5. touching another person
> > 6. in a rude insolent or angry manner
>
> If the State did prove each of these elements beyond a reasonable doubt, you may find the Defendant guilty of involuntary manslaughter, a Class C felony.
>
> You must not find the Defendant guilty of more than one crime.

[18]     During closing, the prosecutor argued "involuntary manslaughter is a different – it's not a charge, it's a lesser-included offense of manslaughter" and "the difference is this: In manslaughter, he has to knowingly kill her; and involuntary manslaughter, he has to knowingly touch her in a rude, insolent, or angry manner." Transcript Volume V at 245-246. The prosecutor argued "if there's some reason you were to believe that he didn't intend to kill her but you do believe he did intend to push her, and she ultimately was killed, then he would not be guilty of voluntary manslaughter if you didn't believe he intentionally killed her but you would believe – he would be guilty of involuntary manslaughter." *Id.* at 246. He argued, "if you believe it's reasonable that this gun went off accidently twice, he's not guilty of voluntary manslaughter at least." *Id.* at 250.

[19]     Larkin's defense counsel argued Larkin shot Stacey accidentally, he did not knowingly shoot her, a person has the right to use deadly force if he reasonably believes the force is necessary to prevent serious bodily injury to him or another, and the State did not prove that he did not act in self-defense. With respect to involuntary manslaughter, defense counsel argued that Larkin's self-defense claim was also a defense to involuntary manslaughter and that he was reasonably fearful.

---

*Id.* at 22.

[20] The prosecutor argued in rebuttal "I'm reluctant to argue it [involuntary manslaughter] because the evidence proves that he is guilty of voluntary manslaughter as charged" and "[t]here can be no question, if for some reason you determine he's not guilty of voluntary, there'd be no question that he's guilty of involuntary manslaughter. He admitted that he pushed her." Transcript Volume VI at 52. The prosecutor argued Larkin intentionally pulled the trigger and he did not accidentally shoot Stacey twice.

[21] The record includes a question submitted by the presiding juror to the trial court which asked: "Can we have a more thorough definition of battery and the elements involved."[5] Appellant's Appendix Volume IV at 34. Following deliberation, the jury found Larkin guilty of involuntary manslaughter as a class C felony.

[22] On October 4, 2019, Larkin filed a motion to vacate the judgment arguing that, for over six years, the State could have amended the information to charge him with involuntary manslaughter or some form of battery but never did so; and on September 13, 2019, minutes before final instructions and closing arguments, he was provided a copy of the State's proposed jury instruction on involuntary manslaughter based on a battery, and he objected. He argued that his counsel was unprepared to explain to the jury how self-defense applied differently to non-lethal force than to lethal force; the jury deliberated for over twelve hours

---

[5] Larkin's brief states that "[t]he trial court did not provide them one." Appellant's Brief at 14.

and asked for clarification of the definition of battery; involuntary manslaughter was not factually included in the voluntary manslaughter offense; and the involuntary manslaughter instruction denied him his right to fair notice and was not based on the same facts alleged in the voluntary manslaughter charge.

[23] Following a sentencing hearing, the court issued an order denying Larkin's motion to vacate the judgment, finding the aggravating circumstance was that the weapon involved was a handgun and the mitigating circumstances were Larkin's lack of criminal history and hardship on his dependents, finding the mitigating circumstances outweighed the aggravating circumstance, and sentencing Larkin to two years. The court ordered that the sentence be stayed until the completion of the appeal.

## *Discussion*

[24] We first address whether the trial court erred in instructing the jury on involuntary manslaughter. A trial court must engage in a three-step analysis when determining whether to instruct a jury on a lesser included offense of the crime charged. *Isom v. State*, 31 N.E.3d 469, 485 (Ind. 2015) (citing *Wright v. State*, 658 N.E.2d 563, 566-567 (Ind. 1995)). First, the court must consider whether the alleged lesser included offense is an inherently included offense to the principal charge. *Id.* If it is not, then the court must decide whether the alleged lesser included offense is a factually included offense to the principal charge. *Id.* Finally, if the alleged lesser included offense is either an inherently or factually included offense to the principal charge, then the court must determine if there is a serious evidentiary dispute regarding the element that

distinguishes the lesser offense from the principal charge. *Id.* If such a dispute is present, the court must give the instruction on the lesser included offense. *Id.*

[25] Larkin maintains the trial court should not have instructed the jury on involuntary manslaughter. He argues involuntary manslaughter was neither an inherently nor a factually included lesser offense of the charged voluntary manslaughter offense. He points out that the charging information made no reference to a battery accomplishing the killing and that it tracked the voluntary manslaughter statute. He further argues the involuntary manslaughter instruction denied him his right to fair notice of the charges against him. He argues his defense to the shooting was that it was an accident in the course of self-defense and that, minutes before closing argument, he was told he was defending against a battery as well as against the shooting, and he observes the prosecutor argued in closing that he was guilty of involuntary manslaughter because he pushed Stacey.

[26] The State argues that, "[w]hen a charging information alleges the use of a handgun, it has alleged a touching that satisfies the elements of battery so that involuntary manslaughter would be a factually-included offense of murder." Appellee's Brief at 16-17. It also argues the involuntary manslaughter instruction was supported by the evidence and asserts: "Here, there were two distinct acts from which the jury could find [Larkin] killed Stacey while committing battery—the first bullet strike and the pushing with the muzzle of the gun that resulted in the second bullet strike." *Id.* at 17.

[27] A person who knowingly or intentionally kills another human being commits murder. Ind. Code § 35-42-1-1. A person who knowingly or intentionally kills another human being while acting under sudden heat commits voluntary manslaughter.[6] Ind. Code § 35-42-1-3(a). The existence of sudden heat is a mitigating factor that reduces what otherwise would be murder under Ind. Code § 35-42-1-1 to voluntary manslaughter. Ind. Code § 35-42-1-3(b).

[28] A person commits involuntary manslaughter when the person "kills another human being while committing or attempting to commit . . . battery . . . ." Ind. Code § 35-42-1-4. A person commits battery when the person knowingly or intentionally touches another person in a rude, insolent, or angry manner. Ind. Code § 35-42-2-1.

[29] "The defendant's intent—the intent to kill or the intent to batter—distinguishes murder from involuntary manslaughter." *Norris v. State*, 943 N.E.2d 362, 368 (Ind. Ct. App. 2011) (citing *Wilson v. State*, 765 N.E.2d 1265, 1271-1272 (Ind. 2002) ("The only element distinguishing murder from involuntary manslaughter is what the defendant intended to do—batter or kill.")), *trans. denied*. Similarly, the defendant's intent (to kill or to batter) distinguishes the offenses of voluntary manslaughter and involuntary manslaughter. *See* Ind. Code § 35-42-1-3; Ind. Code § 35-42-1-4. "Involuntary manslaughter

---

[6] "Sudden heat occurs when a defendant is provoked by anger, rage, resentment, or terror, to a degree sufficient to obscure the reason of an ordinary person, prevent deliberation and premeditation, and render the defendant incapable of cool reflection." *Conner v. State*, 829 N.E.2d 21, 24 (Ind. 2005).

contemplates an *incidental* killing of another." *Blackburn v. State*, 130 N.E.3d 1207, 1212 (Ind. Ct. App. 2019).

[30] Involuntary manslaughter is not an inherently included lesser offense of murder. *Wilson*, 765 N.E.2d at 1271. *See Evans v. State*, 727 N.E.2d 1072, 1081 (Ind. 2000); *Wright*, 658 N.E.2d at 569; *see also Champlain v. State*, 681 N.E.2d 696, 702 (Ind. 1997) (comparing Ind. Code § 35-42-1-1 (1993), with *id.* § 35-42-1-4)."). Similarly, involuntary manslaughter is not an inherently included lesser offense of voluntary manslaughter. *See* Ind. Code § 35-42-1-3; Ind. Code § 35-42-1-4.

[31] While involuntary manslaughter is not an inherently included lesser offense of murder, it may be a "factually included" lesser offense, but only where "the charging instrument alleges that a battery accomplished the killing." *Wilson*, 765 N.E.2d at 1271; *see Wright*, 658 N.E.2d at 567 (observing, "[i]f the charging instrument alleges that the means used to commit the crime charged include all of the elements of the alleged lesser included offense, then the alleged lesser included offense is factually included in the crime charged"); *Sandilla v. State*, 603 N.E.2d 1384, 1387 (Ind. Ct. App. 1992) (noting the alleged battery must have caused the victim's death to support the giving of an involuntary manslaughter instruction), *trans. denied*.

[32] In this case, Stacey died as a result of gunshot wounds on December 11, 2012. The information filed against Larkin two days later charged him with voluntary manslaughter under Ind. Code § 35-42-1-3 and alleged:

On or about the 11th day of December, 2012, at . . . Long Beach, LaPorte County, Indiana, JOHN LARKIN, did knowingly or intentionally kill another human being, to-wit: Stac[e]y Simon Larkin; while acting under sudden heat, such killing being committed by means of a deadly weapon, to-wit: a handgun.

Cause No. 46A05-1411-CR-550, Appellant's Appendix I at 37. While a person may shoot another person with an intent to batter rather than with an intent to kill, *see Champlain*, 681 N.E.2d at 702 (observing a shooting "can in some situations be classified as a battery"),[7] we conclude the charging instrument here did not make such an allegation. The State does not assert that it advanced an argument that Larkin intended to commit a battery by shooting Stacey. Rather, in requesting the involuntary manslaughter instruction, the prosecutor argued Larkin pushed Stacey and that was a battery. *See* Transcript Volume V at 233 (prosecutor arguing: "I think this is factually lesser-included certainly from the evidence. There isn't any question that the Defendant, as he admits, pushed the victim into a corner and surely that is touching in a rude, insolent, or angry manner."). Additionally, the prosecutor argued to the jury in closing that Larkin intended to commit a battery by pushing Stacey. *See id.* at 246 (prosecutor arguing "if . . . you were to believe that he . . . did intend *to push her*, . . . then . . . he would be guilty of involuntary manslaughter") (emphasis added); Transcript Volume VI at 52 (prosecutor arguing "[h]e admitted that *he pushed her*") (emphasis added). Nor can we conclude the charging instrument

---

[7] *Champlain*, as an example, referred to *Lynch v. State,* 571 N.E.2d 537 (Ind. 1991), in which the defendant testified that he had planned to shoot and wound the victim.

made an allegation that Larkin committed battery by pushing Stacey. Stacey died as a result of her gunshot wounds. The charging information referred to a handgun. It did not allege all of the elements of a battery by pushing. We decline to conclude that the mere assertion that the charged offense was committed by means of a handgun, without more, automatically means the information also asserted a battery. The charging instrument did not assert a battery or incidental killing.

[33] Because involuntary manslaughter was not an inherently or factually included lesser offense of the charged crime, the jury should not have received an involuntary manslaughter instruction. *See Champlain*, 681 N.E.2d at 702 (holding "[b]ecause the information did not assert a battery, involuntary manslaughter in this case was not a factually included lesser offense" and the trial court did not err in refusing to give the instruction). *Cf. Galindo v. State*, 62 N.E.3d 1285, 1286-1288 (Ind. Ct. App. 2016) (finding involuntary manslaughter was a factually lesser included offense of murder "in light of the charging information, which alleged [the defendant] caused [the victim's] death by battering her"[8]). *See also Sandilla*, 603 N.E.2d at 1386-1387 (finding battery was a lesser included offense of involuntary manslaughter and that the charging

---

[8] The charging information in *Galindo* alleged the defendant "did knowingly kill another human being . . . by a combination of strangulation and blunt force for injury to her head." Cause No. 32A05-1607-CR-1541, Appellant's Appendix II at 10.

instrument alleged the defendants killed the victim "while committing or attempting to commit the crime of Battery").

[34] Moreover, the prosecutor did not request the involuntary manslaughter instruction until after the evidence was closed and just prior to closing argument. In every criminal case, the accused is entitled to clear notice of the charge against which he must defend at trial. *Wright*, 658 N.E.2d at 565 (citing Ind. Const. art 1, § 13). Defendants are entitled to limit their defense to the crimes charged. *Young v. State*, 30 N.E.3d 719, 720 (Ind. 2015). If there is reasonable doubt as to what the charge includes, such doubt must be resolved in favor of the defendant. *Id.* at 723. Here, Stacey died as a result of being shot, and the charging instrument alleged Larkin knowingly killed her by means of a handgun. Following the close of the evidence, the trial court ruled it would instruct the jury on involuntary manslaughter, and the prosecutor argued Larkin was guilty of involuntary manslaughter and "admitted that he pushed her." Transcript Volume VI at 52. During the trial, Larkin did not challenge evidence that he pushed Stacey. We conclude there is, at a minimum, reasonable doubt as to whether the State's charging instrument provided Larkin with fair notice of the charge of which he was eventually convicted. We are constrained to resolve any such doubt in Larkin's favor. *See Young*, 30 N.E.3d at 723. We conclude that the trial court erred in instructing the jury on involuntary manslaughter. *See id.* at 720 (holding attempted aggravated battery by beating "was not just a *lesser* offense" than the charged murder by shooting but was "a completely *different* offense" based on different "means used" than

alleged in the informations, which deprived the defendants of fair notice to extend their defense to the lesser charge, reversing the defendants' convictions, and remanding for entry of judgments of acquittal).[9]

[35] For the foregoing reasons, we reverse Larkin's conviction for involuntary manslaughter and remand with instructions to enter a judgment of acquittal and order that he be discharged.

[36] Reversed and remanded.

May, J., and Tavitas, J., concur.

---

[9] Larkin additionally argues the State failed to present any evidence from which the jury could infer that he was not acting in self-defense when he pushed Stacey. Based on the lack of sufficient evidence to contradict his statement of self-defense, we are compelled to find the State did not meet its burden of negating his self-defense claim beyond a reasonable doubt. *See Cobbs v. State*, 528 N.E.2d 62 (Ind. 1988) ("Because of the lack of evidence in this case to contradict appellant's statement of self-defense, and because there is a total lack of evidence to support any theory of the shooting other than appellant's explanation, this Court is compelled to reverse this conviction. In view of the fact his conviction is being reversed because of insufficient evidence, the appellant must be discharged."), *reh'g denied*.